Harvey F. JACQUE and Lois C. Jacque, Plaintiffs-Appellants,†

v.

STEENBERG HOMES, INC., Defendant-Respondent.

Court of Appeals

*No. 95–1028. Submitted on briefs January 25, 1996.—Decided March 13, 1996.*

(Also reported in 548 N.W.2d 80.)

†Petition to review granted.

23

On behalf of the plaintiffs-appellants, the cause was submitted on the brief of *Patrick A. Dewane, Jr.* of *Dewane, Dewane, Kummer, Lambert & Fox* of Manitowoc.

On behalf of the defendant-respondent, the cause was submitted on the brief of *Daniel L. Zitzer* of *Mingo & Yankala, S.C.* of Milwaukee.

Before Anderson, P.J., Brown and Nettesheim, JJ.

BROWN, J.   The representatives of Steenberg Homes, Inc. would not take "no" for an answer. Even

after Harvey F. Jacque told them that they could not cross his land to deliver a mobile home to his neighbor, Steenberg Homes' employees bulldozed a path anyway. In the later trespass action, however, the trial court found that Harvey and his wife, Lois C., had only suffered nominal damages. Accordingly, it applied the rule of *Barnard v. Cohen*, 165 Wis. 417, 162 N.W. 480 (1917), which required it to set aside the jury's award of $100,000 in punitive damages because no actual damages existed. Although the Jacques now raise several arguments against application of this rule to these facts, we hold that the trial court was correct to apply it.

Harvey, a retired farmer, and Lois own roughly 170 acres near Wilke's Lake in the town of Schleswig. In the fall of 1993, one of their neighbors purchased a mobile home from Steenberg Homes. In an effort to facilitate delivery, company representatives approached the Jacques seeking permission to cross their land. A small private road provided access to the site, but it had some sharp curves and was not plowed in the winter. Based on their site survey, Steenberg Homes concluded that traversing directly across the Jacques' field would make delivery much simpler. Nevertheless, the Jacques refused.

In the early 1980s, the Jacques allowed some other neighbors located along the lake to park cars on their land. After several years, one neighbor claimed that he now owned this land under adverse possession. Because the Jacques' attorney failed to file a timely answer, they lost roughly $10,000 worth of property in default. Also, the Jacques believed that the DNR had taken advantage of them during negotiations to acquire a conservation easement along the lake. As a result, the Jacques had become very sensitive about

outsiders entering onto their property and were unwilling to help Steenberg Homes.

On February 15, 1994, Harvey thus became concerned when he saw a mobile home parked across the street. He spoke to the movers, who told him that they planned to take the mobile home through the DNR easement. Some discussion followed as Harvey brought out a tax map to show the movers how they would still be crossing his field. He then allowed the movers to use his phone to contact their supervisors at Steenberg Homes. A manager eventually came to the scene. Harvey also called a town official.

After the parties went over the maps, it became apparent that the movers would indeed have to cross over the Jacques' property or face plowing through the heavy snow that covered the private road. At that time, the Steenberg Homes manager made further attempts to bargain with the Jacques for the right to cross their field, but they remained steadfast. The movers then left to begin the task of taking the mobile home down the private access.

Steenberg Homes, however, did not honor the Jacques' warning. According to one of the movers, the manager told him "I don't give [a F—] what he said, just get that home in there any way you can." So once the movers had proceeded far enough down the road to be out of the Jacques' sight, they used their "cat" to cut a path through the snow-covered field and left the mobile home at the site. The mover also admitted that the manager started "giggling and laughing" when he learned how they had accomplished delivery.

When the Jacques learned what happened, they summoned the sheriff. After an officer surveyed the damage to the Jacques' field, he tracked down the manager and issued a thirty dollar citation. The Jacques

also brought this action for trespass seeking compensatory and punitive damages.

While Steenberg Homes was willing to concede that it had trespassed, it contested whether the Jacques had suffered any harm. The Jacques' son testified that he had to spend an additional three to four hours clearing the field that spring and that his equipment and manpower costs totaled about seventy-five dollars per hour. The son explained, however, that these extra expenses had not reduced the rent he pays to his parents.

Accordingly, Steenberg Homes moved for a directed verdict at the close of the Jacques' case. *See* § 805.14(3), STATS. It argued that the court should find that Steenberg Homes had trespassed, but contended that the Jacques could only establish nominal damages.

The trial court agreed and directed judgment to the Jacques for trespass and nominal damages. But it still allowed the jury to consider if punitive damages were appropriate. The jury subsequently returned a verdict finding that Steenberg Homes' conduct was "outrageous" and that punitive damages should be assessed at $100,000.

During postverdict proceedings, however, the trial court granted Steenberg Homes' motion for a directed verdict and reversed the punitive damages award. *See* § 805.14(5)(d), STATS. It primarily reasoned that the *Barnard* rule prevented it from awarding punitive damages because it had found that the Jacques had only suffered nominal damages.

On appeal, the Jacques complain that the trial court erred when it found that they had only suffered nominal damages. Alternatively, they argue that the rule within *Barnard* is not applicable in these circum-

stances. The Jacques specifically assert that their claim fits into an exception which allows for punitive damages when there has been even a nominal invasion of a constitutional right, i.e., a "right" to exclusive enjoyment of their land. They also argue that there should be a similar exception to *Barnard* which would apply to intentional trespass claims. We reject all these arguments and affirm.

█

We first turn to whether the trial court erred when it found that the Jacques had only suffered nominal damages and directed the verdict for Steenberg Homes. If the trial court erred on this issue, then the punitive damages verdict could be preserved and the new trial limited to the question of compensation. *See Badger Bearing, Inc. v. Drives & Bearings, Inc.*, 111 Wis. 2d 659, 674-75, 331 N.W.2d 847, 855-56 (Ct. App. 1983). And if compensatory damages were awarded, then the *Barnard* rule simply would not apply.

The Jacques raise two specific arguments, one on the law and one on the facts. First, they contend that the trial court wrongly concluded that compensation for "disturbance and annoyance" traditionally associated with a nuisance action could not be obtained in a trespass action. *See Prah v. Maretti*, 108 Wis. 2d 223, 232, 321 N.W.2d 182, 187 (1982) (quoted source omitted). Just as the *Prah* court recognized that the common law of private nuisance must be flexed to allow for changing land use values, *see id.* at 239-40, 321 N.W.2d at 191, the Jacques argue that the trial court should have molded the common law action of trespass to account for changing perspectives about a person's right to quiet enjoyment of his or her land. Next, they challenge the trial court's factual findings. The Jacques argue that the court did not properly assess their evi-

dence showing the extra efforts that their son spent clearing the field the following spring.

Steenberg Homes responds with a claim that the Jacques lost their right to pursue these arguments on appeal. We agree.

Because the Jacques filed their postverdict motions outside the twenty-day window set out in § 805.16, STATS., the trial court found that it was not competent to address these arguments. As a result, the Jacques' ability to appeal claims is limited. *See Hartford Ins. Co. v. Wales*, 138 Wis. 2d 508, 510-11, 406 N.W.2d 426, 427 (1987).

While we could rely on our discretion to address these two questions, *see id.* at 517, 406 N.W.2d at 429-30, we must reserve it for cases where there has been a miscarriage of justice. *See* § 752.35, STATS. The Jacques, however, are not complaining about a procedural error made by the trial court. *See, e.g., Schmidt v. Smith*, 162 Wis. 2d 363, 374, 469 N.W.2d 855, 859 (Ct. App. 1991) (reversing award which was twice the legally permissible limit). Rather, they ask us to overlook *their* mistake. Our discretion should not be applied in such circumstances.

We now approach the Jacques' arguments regarding the application of the *Barnard* rule. They raise two points suggesting why it should not apply here.[1]

---

[1] The Jacques also raise a separate argument premised on the Remedy for Wrongs provision of the Wisconsin Constitution. WISCONSIN CONST., ART. I, § 9. They contend that this clause entitles them to an appropriate remedy for the harm caused by Steenberg Homes. However, in *Diana Shooting Club v. Lamoreux*, 114 Wis. 44, 89 N.W. 880 (1902), the court held that awarding nominal damages was a sufficient "remedy" for trespass. *See id.* at 58-60, 89 N.W. at 885-86. We therefore reject the

The *Barnard* rule against awarding punitive damages when actual damages are "merely nominal" is rationalized in the following manner. *See Barnard*, 165 Wis. at 418, 162 N.W. at 480-81. Since punitive damages deter bad conduct, courts tolerate the overcompensation of victims because society enjoys the benefit of having bad conduct deterred. *See Maxwell v. Kennedy*, 50 Wis. 645, 649, 7 N.W. 657, 658-59 (1880); *see also* Lynn A. Lorenson, Note, *Tucker v. Marcus: Punitive Damages Claims Under the Comparative Negligence Statute*, 1989 WIS. L. REV. 745, 749. Accordingly, if the victim cannot show actual harm, then society has little interest in having this bad, but otherwise harmless, conduct deterred. *See Maxwell*, 50 Wis. at 649, 7 N.W. at 659; Note, 1989 WIS. L. REV. at 751 n.42.

As the Jacques correctly explain, however, there are exceptions to this general rule. First, it is relaxed when the victim's constitutional rights are involved. *See Fletcher v. Eagle River Memorial Hosp.*, 150 Wis. 2d 145, 154-55, 441 N.W.2d 297, 301 (Ct. App. 1989), *rev'd on other grounds*, 156 Wis. 2d 165, 456 N.W.2d 788 (1990). The Jacques thus focus on how Steenberg Homes invaded their "constitutional right" to the "exclusive enjoyment" of their land.

Nonetheless, their reliance on *Fletcher* is misplaced. This exception is specifically limited to actions brought against government actors. *See id.* Steenberg Homes is not a government actor; hence, this exception does not fit. *See Weber v. City of Cedarburg*, 129 Wis. 2d 57, 65, 384 N.W.2d 333, 338 (1986).

Since the Jacques did not suffer at the hands of bad government, they urge this court to recognize

Jacques' suggestion that this clause guarantees them anything else.

another exception to the *Barnard* rule. They argue that the general rule should be relaxed in trespass actions.

The Jacques assert that society has a strong interest in having intentional trespasses deterred, regardless of the actual harm that results. Their briefs describe how they are "elderly and physically infirm" and thus are in a poor position to "physically protect their rights." Moreover, they suggest that permitting courts and juries to assess punitive damages in these circumstances is the only way to prevent trespassers, like Steenberg Homes, from "running roughshod" over the disadvantaged.

Our research into the origins of Wisconsin's rule allowing punitive damages reveals that this argument has some merit. In one of the earliest cases on this issue, *McWilliams v. Bragg*, 3 Wis. 377, [*424] (1854), the supreme court allowed the jury in a trespass case to assess "damages as a punishment to the defendant for the purpose of making an example." *Id.* at 377, [*424]. In reaching this decision, the court examined the development of the doctrine in other jurisdictions and approved of the reasoning applied in the case of *Merest v. Harvey,* 128 Eng. Rep. 761 (C.P. 1814).

That English case is separated by one hundred ninety years and the Atlantic Ocean, but nonetheless involved wrongful conduct which could easily happen today in some areas of Wisconsin. A landowner was shooting birds in his field when he was approached by the local magistrate who wanted to join him. Although the landowner refused, the magistrate proceeded to hunt. And when the landowner continued to object, the magistrate threatened to have him jailed and dared him to file suit. *Id.*

Although there was little actual harm, the English court upheld damages of five hundred pounds. It

31

explained that "in a case where a man disregards every principle which actuates the conduct of gentlemen, what is to restrain him *except large damages*?" *Id.* at 761 (emphasis added).

The Wisconsin Supreme Court also lifted the following hypothetical proposed by Chief Justice Gibbs of the English court:

> Suppose a gentleman has a paved walk in his paddock, before his window, and that a man intrudes and walks up and down before the window of his house, and looks in while the owner is at dinner, is the trespasser to be permitted to say "here is a half-penny for you which is the full extent of all the mischief I have done." Would that be a compensation?

*McWilliams*, 3 Wis. at 380, [*428] (quoting *Merest*, 128 Eng. Rep. at 761). These two fact patterns reveal that the original intent of punitive damages was to remedy the exact problem targeted by the Jacques—fending off the trespasser who will not take "no" for an answer.

This case, however, is not only about how punitive damages could remedy the Jacques' problem. Because it is a trespass case, this case also raises questions about how society should value property. This court must determine if enforcing a person's "right" to quiet enjoyment is so great that we should tolerate the over-compensation of trespass victims.

The early common law cases suggest that the answer to this question is "yes." We observe, however, that the supreme court subsequently addressed this question and held that the answer is "no." In *Sunderman v. Warnken*, 251 Wis. 471, 29 N.W.2d 496 (1947), the supreme court applied *Barnard* in a trespass action. There, the tenants brought a trespass

32

action after the landlord had conducted an unannounced inspection of their apartment. *See id.* at 472-73, 29 N.W.2d at 497. While the landlord did not cause any actual harm, the tenants still argued for a trial on punitive damages. The court, however, applied the *Barnard* maxim and dismissed the case explaining that the most the tenants could secure would be nominal damages. *See id.* at 477, 29 N.W.2d at 499.

While *Sunderman* does not discuss the early common law cases which had allowed punitive damages in trespass actions, the decision nonetheless reveals that the supreme court has rejected, *sub silento*, its earlier belief, voiced in *McWilliams*, that punitive damages could be assessed in such claims. We therefore hold that the trial court correctly followed *Barnard* (and *Sunderman*) to preclude the Jacques' claim. We affirm the order granting the verdict to Steenberg Homes.

Although precedent squarely dictates this outcome, this case might be a good one for our supreme court to review. On one hand, the *Barnard* rule, and the decision it compels us to write, might send the wrong signal to Steenberg Homes, construction firms, recreational adventurers and any other potential trespasser. As the Jacques have argued, our decision implicitly tells these parties that they are free to go where they please, regardless of the wishes of the owner. So long as they leave no lasting imprint, the only deterrent they face is the possibility of a Class B forfeiture. *See* § 943.13, STATS. If the role of American courts is to protect individual property rights, the *Barnard* rule may seem to many to be an unwise hindrance.

On the other hand, we believe that the *Barnard* rule implicitly reflects our society's changing values

about property rights. The early cases we described did place great emphasis on a person's right to exclude others. But in the 19th century, enforcing these rights also served to allocate land in an efficient manner. Life in Wisconsin (and England) was simple enough, i.e., uniformly agrarian, that forcing people to bargain with each other for the right to use land served as a good means of assuring that land was well allocated. *See* RICHARD A. POSNER, ECONOMIC ANALYSIS OF LAW 56-57 (4th ed. 1992) (describing allocation of land when market transaction costs are low).

A century later, we still face the same conflicts between landowner and trespasser. Moreover, the human element is the same—people do not like trespassers. But because the uses to which land are put have changed dramatically, the marketplace in which people exchange land is also vastly different. In 19th century Wisconsin, mobile home dealers were not asking farmers to "borrow" their land for a few minutes so that they could make a delivery. In 19th century Wisconsin, landlords did not need to get onto their tenants' property to check for health department violations. *Compare Sunderman*, 251 Wis. at 473, 29 N.W.2d at 497. Thus, we still have "outrageous" behavior by trespassers, if outrageousness is defined by refusing to honor a landowner's refusal to enter, but in our increasingly complex society, not all "outrageous" behavior results in a bad distribution of land. Thus, using punitive damages to deter outrageous trespassers may not necessarily secure society's interest in having land efficiently distributed.

We see this phenomenon in this case. Here, Steenberg Homes argued to the jury that the only way to deliver this mobile home was to haul it across the Jacques' property. Although we do not challenge the jury's

verdict that Steenberg Homes acted outrageously, such evidence nonetheless reveals that it had to somehow bargain for the Jacques' permission if it wanted to get this home to the site. Steenberg Homes, however, faced a no-win situation. There was no way that Steenberg Homes could purchase a right to enter because the Jacques placed a priceless value, incapable of measurement, on the quiet enjoyment of their land.

In this light, this case does not necessarily present a question of whether Steenberg Homes' outrageous behavior will be sanctioned, but rather it focuses on whether the civil justice system should have a role in enforcing the Jacques' belief that their land was priceless. We believe that the rule revealed in *Barnard* and *Sunderman* holds that such values are no longer recognized. Of course, punitive damages still have a role in securing a person's private property against trespass, but such damages are limited to situations in which the trespasser threatens a marketable value to land. If this aspect of our civil justice system is to change, that change will have to come from our supreme court.

*By the Court.*—Judgment affirmed.