Harvey F. JACQUE and Lois C. Jacque, Plaintiffs-Appellants-Petitioners,

v.

STEENBERG HOMES, INC., Defendant-Respondent.

Supreme Court

*No. 95–1028. Oral argument January 29, 1997.—Decided May 16, 1997.*

(Also reported in 563 N.W.2d 154.)

For the plaintiffs-appellants there were briefs by *Patrick A. Dewane, Jr.* And *Dewane, Dewane, Kummer, Lambert & Fox*, Manitowoc and oral argument by *Patrick A. Dewane, Jr.*

For the defendant-respondent there were briefs by *Mark J. Mingo, Daniel L. Zitzer* and *Mingo & Yankala, S.C.*, Milwaukee and oral argument by *Mark Mingo.*

¶ 1. WILLIAM A. BABLITCH, J. Steenberg Homes had a mobile home to deliver. Unfortunately for Harvey and Lois Jacque (the Jacques), the easiest route of delivery was across their land. Despite adamant protests by the Jacques, Steenberg plowed a path through the Jacques' snow-covered field and via that path, delivered the mobile home. Consequently, the Jacques sued Steenberg Homes for intentional trespass. At trial, Steenberg Homes conceded the intentional trespass, but argued that no compensatory damages had been proved, and that punitive damages could not be awarded without compensatory damages. Although the jury awarded the Jacques $1 in nominal damages and $100,000 in punitive damages, the circuit court set aside the jury's award of $100,000. The court of appeals affirmed, reluctantly concluding that it could not reinstate the punitive damages because it was bound by precedent establishing that an award of nominal damages will not sustain a punitive damage award. We conclude that when nominal damages are awarded for an intentional trespass to land, punitive damages may, in the discretion of the jury, be awarded.

We further conclude that the $100,000 awarded by the jury is not excessive. Accordingly, we reverse and remand for reinstatement of the punitive damage award.

I.

¶ 2. The relevant facts follow. Plaintiffs, Lois and Harvey Jacques, are an elderly couple, now retired from farming, who own roughly 170 acres near Wilke's Lake in the town of Schleswig. The defendant, Steenberg Homes, Inc. (Steenberg), is in the business of selling mobile homes. In the fall of 1993, a neighbor of the Jacques purchased a mobile home from Steenberg. Delivery of the mobile home was included in the sales price.

¶ 3. Steenberg determined that the easiest route to deliver the mobile home was across the Jacques' land. Steenberg preferred transporting the home across the Jacques' land because the only alternative was a private road which was covered in up to seven feet of snow and contained a sharp curve which would require sets of "rollers" to be used when maneuvering the home around the curve. Steenberg asked the Jacques on several separate occasions whether it could move the home across the Jacques' farm field. The Jacques refused. The Jacques were sensitive about allowing others on their land because they had lost property valued at over $10,000 to other neighbors in an adverse possession action in the mid–1980's. Despite repeated refusals from the Jacques, Steenberg decided to sell the mobile home, which was to be used as a summer cottage, and delivered it on February 15, 1994.

¶ 4. On the morning of delivery, Mr. Jacque observed the mobile home parked on the corner of the

town road adjacent to his property. He decided to find out where the movers planned to take the home. The movers, who were Steenberg employees, showed Mr. Jacque the path they planned to take with the mobile home to reach the neighbor's lot. The path cut across the Jacques' land. Mr. Jacque informed the movers that it was the Jacques' land they were planning to cross and that Steenberg did not have permission to cross their land. He told them that Steenberg had been refused permission to cross the Jacques' land.

¶ 5. One of Steenberg's employees called the assistant manager, who then came out to the Jacques' home. In the meantime, the Jacques called and asked some of their neighbors and the town chairman to come over immediately. Once everyone was present, the Jacques showed the assistant manager an aerial map and plat book of the township to prove their ownership of the land, and reiterated their demand that the home not be moved across their land.

¶ 6. At that point, the assistant manager asked Mr. Jacque how much money it would take to get permission. Mr. Jacque responded that it was not a question of money; the Jacques just did not want Steenberg to cross their land. Mr. Jacque testified that he told Steenberg to "[F]ollow the road, that is what the road is for." Steenberg employees left the meeting without permission to cross the land.

¶ 7. At trial, one of Steenberg's employees testified that, upon coming out of the Jacques' home, the assistant manager stated: "I don't give a ---- what [Mr. Jacque] said, just get the home in there any way you can." The other Steenberg employee confirmed this testimony and further testified that the assistant manager told him to park the company truck in such a way that no one could get down the town road to see the

611

route the employees were taking with the home. The assistant manager denied giving these instructions, and Steenberg argued that the road was blocked for safety reasons.

¶ 8. The employees, after beginning down the private road, ultimately used a "bobcat" to cut a path through the Jacques' snow-covered field and hauled the home across the Jacques' land to the neighbor's lot. One employee testified that upon returning to the office and informing the assistant manager that they had gone across the field, the assistant manager reacted by giggling and laughing. The other employee confirmed this testimony. The assistant manager disputed this testimony.

¶ 9. When a neighbor informed the Jacques that Steenberg had, in fact, moved the mobile home across the Jacques' land, Mr. Jacque called the Manitowoc County Sheriff's Department. After interviewing the parties and observing the scene, an officer from the sheriff's department issued a $30 citation to Steenberg's assistant manager.

¶ 10. The Jacques commenced an intentional tort action in Manitowoc County Circuit Court, Judge Allan J. Deehr presiding, seeking compensatory and punitive damages from Steenberg. The case was tried before a jury on December 1, 1994. At the completion of the Jacques' case, Steenberg moved for a directed verdict under Wis. Stat. § 805.14(3) (1993–94).[1] For purposes of the motion, Steenberg admitted to an intentional trespass to land, but asked the circuit court to find that the Jacques were not entitled to compensatory damages or punitive damages based on insufficiency of the evidence. The circuit court denied Steenberg's motion

---

[1] All future statutory references are to the 1993–94 volume unless otherwise indicated.

and the questions of punitive and compensatory damages were submitted to the jury. The jury awarded the Jacques $1 nominal damages and $100,000 punitive damages. Steenberg filed post-verdict motions claiming that the punitive damage award must be set aside because Wisconsin law did not allow a punitive damage award unless the jury also awarded compensatory damages. Alternatively, Steenberg asked the circuit court to remit the punitive damage award. The circuit court granted Steenberg's motion to set aside the award. Consequently, it did not reach Steenberg's motion for remittitur.

¶ 11. This case presents three issues: (1) whether an award of nominal damages for intentional trespass to land may support a punitive damage award and, if so; (2) whether the law should apply to Steenberg or should only be applied prospectively and, if we apply the law to Steenberg; (3) whether the $100,000 in punitive damages awarded by the jury is excessive.

¶ 12. The first issue is a question of law which we review *de novo*. The second issue involves the prospective application of a judicial holding which is a question of policy to be determined by this court. *Harmann v. Hadley*, 128 Wis. 2d 371, 378, 382 N.W.2d 673 (1986). The court allows prospective application for the purpose of mitigating hardships that may occur with the retroactive application of new rules. *Colby v. Columbia County*, 202 Wis. 2d 342, 364, 550 N.W.2d 124 (1996). Finally, where, as here, the circuit court did not provide a reasoned analysis supporting or rejecting remittitur, in order to determine whether to remit the punitive damages awarded, a reviewing court must review the entire record as a matter of first impression and determine whether, in its judgment, the damage

award is excessive. *Fahrenberg v. Tengel*, 96 Wis. 2d 211, 230, 291 N.W.2d 516 (1980).

## II.

¶ 13. Before the question of punitive damages in a tort action can properly be submitted to the jury, the circuit court must determine, as a matter of law, that the evidence will support an award of punitive damages. *Lievrouw v. Roth*, 157 Wis. 2d 332, 344, 459 N.W.2d 850 (Ct. App. 1990). To determine whether, as a matter of law, the question of punitive damages should have been submitted to the jury, this court reviews the record *de novo. Bank of Sun Prairie v. Esser*, 155 Wis. 2d 724, 736, 456 N.W.2d 585 (1990); *Lievrou*, 157 Wis. 2d at 344.

¶ 14. Steenberg argues that, as a matter of law, punitive damages could not be awarded by the jury because punitive damages must be supported by an award of compensatory damages and here the jury awarded only nominal and punitive damages. The Jacques contend that the rationale supporting the compensatory damage award requirement is inapposite when the wrongful act is an intentional trespass to land. We agree with the Jacques.

¶ 15. Our analysis begins with a statement of the rule and the rationale supporting the rule. First, we consider the individual and societal interests implicated when an intentional trespass to land occurs. Then, we analyze the rationale supporting the rule in light of these interests.

¶ 16. The general rule was stated in *Barnard v. Cohen*, 165 Wis. 417, 162 N.W.2d 480 (1917), where the question presented was: "In an action for libel, can

614

there be a recovery of punitory damages if only nominal compensatory damages are found?" With the bare assertion that authority and better reason supported its conclusion, the *Barnard* court said no. *Id.* at. 418. *Barnard* continues to state the general rule of punitive damages in Wisconsin. *See Tucker v. Marcus*, 142 Wis. 2d 425, 438–40, 418 N.W.2d 818 (1988). The rationale for the compensatory damage requirement is that if the individual cannot show actual harm, he or she has but a nominal interest, hence, society has little interest in having the unlawful, but otherwise harmless, conduct deterred, therefore, punitive damages are inappropriate. *Jacque v. Steenberg Homes, Inc.*, 201 Wis. 2d 22, 548 N.W.2d 80 (Ct. App. 1996); *Maxwell v. Kennedy*, 50 Wis. 645, 649, 7 N.W. 657 (1880).

¶ 17. However, whether nominal damages can support a punitive damage award in the case of an intentional trespass to land has never been squarely addressed by this court.[2] Nonetheless, Wisconsin law is not without reference to this situation. In 1854 the court established punitive damages, allowing the assessment of "damages as a punishment to the defendant for the purpose of making an example."

---

[2] Although Steenberg cites *Sunderman v. Warnken*, 251 Wis. 471, 29 N.W.2d 496 (1947), for the proposition that the *Barnard* rule applies to a trespass case, we disagree. *Barnard*, 165 Wis. 417. In *Sunderman*, the court affirmed the order dismissing the tenants action against the landlord for wrongful and illegal entry. The court held that "a landlord who entered the leased premises in order to make necessary repairs, as required by public officials" had not violated the lease, i.e., the court found that there had not been a wrongful entry. In light of this holding, any discussion of the *Barnard* rule was dicta. *Sunderman*, 251 Wis. at 477.

*McWilliams v. Bragg*, 3 Wis. 377, 378 (1854).[3] The *McWilliams* court related the facts and an illustrative tale from the English case of *Merest v. Harvey*, 128 Eng. Rep. 761 (C.P. 1814), to explain the rationale underlying punitive damages.

¶ 18. In *Merest,* a landowner was shooting birds in his field when he was approached by the local magistrate who wanted to hunt with him. Although the landowner refused, the magistrate proceeded to hunt. When the landowner continued to object, the magistrate threatened to have him jailed and dared him to file suit. Although little actual harm had been caused, the English court upheld damages of 500 pounds, explaining "in a case where a man disregards every principle which actuates the conduct of gentlemen, what is to restrain him except large damages?" *McWilliams*, 3 Wis. 377 at 380.

¶ 19. To explain the need for punitive damages, even where actual harm is slight, *McWilliams* related the hypothetical tale from *Merest* of an intentional trespasser:

> Suppose a gentleman has a paved walk in his paddock, before his window, and that a man intrudes and walks up and down before the window of his house, and looks in while the owner is at dinner, is the trespasser permitted to say "here is a halfpenny for you which is the full extent of the mischief I have done." Would that be a compensation? I cannot say that it would be. . . .

*McWilliams*, 3 Wis. At 380–81. Thus, in the case establishing punitive damages in this state, this court

[3] Because *McWilliams* was an action of trespass for assault and battery, we cite it not for its precedential value, but for its reasoning.

recognized that in certain situations of trespass, the actual harm is not in the damage done to the land, which may be minimal, but in the loss of the individual's right to exclude others from his or her property and, the court implied that this right may be punished by a large damage award despite the lack of measurable harm.

¶ 20. Steenberg contends that the rule established in *Barnard* prohibits a punitive damage award, as a matter of law, unless the plaintiff also receives compensatory damages. Because the Jacques did not receive a compensatory damage award, Steenberg contends that the punitive damage award must be set aside. The Jacques argue that the rationale for not allowing nominal damages to support a punitive damage award is inapposite when the wrongful act involved is an intentional trespass to land. The Jacques argue that both the individual and society have significant interests in deterring intentional trespass to land, regardless of the lack of measurable harm that results. We agree with the Jacques. An examination of the individual interests invaded by an intentional trespass to land, and society's interests in preventing intentional trespass to land, leads us to the conclusion that the *Barnard* rule should not apply when the tort supporting the award is intentional trespass to land.

¶ 21. We turn first to the individual landowner's interest in protecting his or her land from trespass. The United States Supreme Court has recognized that the private landowner's right to exclude others from his or her land is "one of the most essential sticks in the bundle of rights that are commonly characterized as property." *Dolan v. City of Tigard*, 512 U.S. 374, 384 (1994); (quoting *Kaiser Aetna v. United States*, 444 U.S. 164, 176 (1979)). *Accord Nollan v. California Coastal*

617

*Comm'n*, 483 U.S. 825, 831 (1987) (quoting *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 433 (1982).[4] This court has long recognized "[e]very person['s] constitutional right to the exclusive enjoyment of his own property for any purpose which does not invade the rights of another person." *Diana Shooting Club v. Lamoreux*, 114 Wis. 44, 59 (1902) (holding that the victim of an intentional trespass should have been allowed to take judgment for nominal damages and costs). Thus, both this court and the Supreme Court recognize the individual's legal right to exclude others from private property.

¶ 22. Yet a right is hollow if the legal system provides insufficient means to protect it. Felix Cohen offers the following analysis summarizing the relationship between the individual and the state regarding property rights:

> [T]hat is property to which the following label can be attached:
>
> To the world:
>
> Keep off X unless you have my permission, which I may grant or withhold.
>
> Signed: Private Citizen
> Endorsed: The state

Felix S. Cohen, *Dialogue on Private Property*, IX Rutgers Law Review 357, 374 (1954). Harvey and Lois Jacque have the right to tell Steenberg Homes and any other trespasser, "No, you cannot cross our land." But that right has no practical meaning unless protected by

---

[4] We refer to these cases only to emphasize the nature of the Jacques' interest and, correspondingly, Steenberg's violation.

the State. And, as this court recognized as early as 1854, a "halfpenny" award does not constitute state protection.

¶ 23. The nature of the nominal damage award in an intentional trespass to land case further supports an exception to *Barnard*. Because a legal right is involved, the law recognizes that actual harm occurs in every trespass. The action for intentional trespass to land is directed at vindication of the legal right. W. Page Keeton, *Prosser and Keeton on Torts*, § 13 (5th ed. 1984). The law infers some damage from every direct entry upon the land of another. *Id.* The law recognizes actual harm in every trespass to land whether or not compensatory damages are awarded. *Id.* Thus, in the case of intentional trespass to land, the nominal damage award represents the recognition that, although immeasurable in mere dollars, actual harm has occurred.

¶ 24. The potential for harm resulting from intentional trespass also supports an exception to *Barnard*. A series of intentional trespasses, as the Jacques had the misfortune to discover in an unrelated action, can threaten the individual's very ownership of the land. The conduct of an intentional trespasser, if repeated, might ripen into prescription or adverse possession and, as a consequence, the individual landowner can lose his or her property rights to the trespasser. *See* Wis. Stat. § 893.28.

¶ 25. In sum, the individual has a strong interest in excluding trespassers from his or her land. Although only nominal damages were awarded to the Jacques, Steenberg's intentional trespass caused actual harm. We turn next to society's interest in protecting private property from the intentional trespasser.

619

¶ 26. Society has an interest in punishing and deterring intentional trespassers beyond that of protecting the interests of the individual landowner. Society has an interest in preserving the integrity of the legal system. Private landowners should feel confident that wrongdoers who trespass upon their land will be appropriately punished. When landowners have confidence in the legal system, they are less likely to resort to "self-help" remedies. In *McWilliams*, the court recognized the importance of " 'prevent[ing] the practice of dueling, [by permitting] juries [ ] to *punish* insult by exemplary damages.' " *McWilliams*, 3 Wis. at 381. Although dueling is rarely a modern form of self-help, one can easily imagine a frustrated landowner taking the law into his or her own hands when faced with a brazen trespasser, like Steenberg, who refuses to heed no trespass warnings.

██

¶ 27. People expect wrongdoers to be appropriately punished. Punitive damages have the effect of bringing to punishment types of conduct that, though oppressive and hurtful to the individual, almost invariably go unpunished by the public prosecutor. Kink v. Combs, 28 Wis. 2d 65, 135 N.W.2d 789 (1965). The $30 forfeiture was certainly not an appropriate punishment for Steenberg's egregious trespass in the eyes of the Jacques. It was more akin to Merest's "halfpenny." If punitive damages are not allowed in a situation like this, what punishment will prohibit the intentional trespass to land? Moreover, what is to stop Steenberg Homes from concluding, in the future, that delivering its mobile homes via an intentional trespass and paying the resulting Class B forfeiture, is not more profitable than obeying the law? Steenberg Homes plowed a path across the Jacques' land and dragged the

mobile home across that path, in the face of the Jacques' adamant refusal. A $30 forfeiture and a $1 nominal damage award are unlikely to restrain Steenberg Homes from similar conduct in the future. An appropriate punitive damage award probably will.

■

¶ 28. In sum, as the court of appeals noted, the *Barnard* rule sends the wrong message to Steenberg Homes and any others who contemplate trespassing on the land of another. It implicitly tells them that they are free to go where they please, regardless of the landowner's wishes. As long as they cause no compensable harm, the only deterrent intentional trespassers face is the nominal damage award of $1, the modern equivalent of *Merest's* halfpenny, and the possibility of a Class B forfeiture under Wis. Stat. § 943.13. We conclude that both the private landowner and society have much more than a nominal interest in excluding others from private land. Intentional trespass to land causes actual harm to the individual, regardless of whether that harm can be measured in mere dollars. Consequently, the *Barnard* rationale will not support a refusal to allow punitive damages when the tort involved is an intentional trespass to land. Accordingly, assuming that the other requirements for punitive damages have been met, we hold that nominal damages may support a punitive damage award in an action for intentional trespass to land.

¶ 29. Our holding is supported by respected legal commentary. The Restatement (Second) of Torts supports the proposition that an award of nominal damages will support an award of punitive damages in a trespass to land action:

> The fact that the actor knows that his entry is without the consent of the possessor and without

any other privilege to do so, while not necessary to make him liable, may affect the amount of damages recoverable against him, by showing such a complete disregard of the possessor's legally protected interest in the exclusive possession of his land as to justify the imposition of punitive in addition to nominal damages for even a harmless trespass, or in addition to compensatory damages for one which is harmful.

Restatement (Second) of Torts § 163 cmt. e (1979). The Restatement reiterates this position under the punitive damages section: nominal damages support an award of punitive damages "when a tort, such as trespass to land, is committed for an outrageous purpose, but no significant harm has resulted." Restatement (Second) of Torts § 908 cmt. c (1979).

¶ 30. Prosser also finds the compensatory damages prerequisite unsupportable:

Since it is precisely in the cases of nominal damages that the policy of providing an incentive for plaintiffs to bring petty outrages into court comes into play, the view very much to be preferred appears to be that of the minority which have held that there is sufficient support for punitive damages.

W. Page Keeton, et. al., *Prosser and Keeton on the Law of Torts* § 2, at 14 (5th ed. 1984) (citations omitted). A minority of other jurisdictions follow this approach. *See*, Annotation, *Sufficiency of Showing of Actual Damages to Support Award of Punitive Damages - Modern Cases*, 40 A.L.R.4th 11, 36 (1985).

### III.

¶ 31. Next we consider the effect of our holding on the parties before us. Steenberg argues that its reli-

ance at trial on the well-established *Barnard* rule compels this court to either apply our holding prospectively, or grant a new trial.

¶ 32. Steenberg argues if we should hold, as we do, that punitive damages can be awarded with only a nominal damage award, our holding should not apply to them. Steenberg cites *Colby*, 202 Wis. 2d 342, for the proposition that a holding that departs from past precedent should only be applied prospectively. Steenberg argues that because it relied on the well-established *Barnard* rule at trial, and our holding today recognizes an exception to the *Barnard* rule, today's holding should not apply to this case. Steenberg misunderstands *Colby* and the doctrine of sunbursting.

¶ 33. Sunbursting[5] is an exception to the general rule referred to as the "Blackstonian Doctrine." *Fitzgerald v. Meissner & Hicks, Inc.*, 38 Wis. 2d 571, 575, 157 N.W.2d 595 (1968). This classic doctrine provides that a decision which overrules precedent is accorded retroactive effect. Thomas E. Fairchild, *Limitation of New Judge-Made Law to Prospective Effect Only: "Prospective Overruling" or "Sunbursting"*, 51 Marq. L. Rev. 254 (1967–68).

---

[5] Judge Thomas Fairchild has suggested that "[i]f one thinks of a judicially pronounced new rule of law as the rosy dawn of a new day, 'sunbursting' has an appropriate connotation." Thomas E. Fairchild, *Limitation of New Judge-Made Law to Prospective Effect Only: "Prospective Overruling" or "Sunbursting"*, 51 Marq. L. Rev. 254, 255 (1967–68). However, the illustrative nature of the term is purely coincidental. Prospective overruling earned the nickname "sunbursting" from the name of a party to litigation involving prospective application. *Great Northern Railway Company v. Sunburst Oil & Refining Co.*, 287 U.S. 358 (1932).

¶ 34. At times, inequities will occur when a court departs from precedent and announces a new rule of law. In an effort to avoid inequity on these rare occasions, the court has recognized exceptions to the Blackstonian Doctrine and used the device of prospective overruling, known as "sunbursting," to limit the effect of a newly announced rule when retroactive application would be inequitable.

¶ 35. Prospective application of a judicial holding is a question of policy to be determined by this court. *Harmann*, 128 Wis. 2d at 378. The court allows sunbursting for the purpose of mitigating hardships that may occur with the retroactive application of a new rule. *Colby*, 202 Wis. 2d at 364. This court will not sunburst absent a compelling judicial reason for doing so. *Harmann*, 128 Wis. 2d at 379 (citation omitted). No simple rule helps us determine the existence of a judicial reason for sunbursting. *Id.* Instead, the equities peculiar to a given rule or case determine the rule adopted by the court in each case.

¶ 36. Steenberg contends that its reliance on *Barnard* at trial creates a compelling judicial reason to sunburst. Steenberg explains that its trial strategy was dependent on the *Barnard* rule. Therefore, it contends that a holding in this case, recognizing an exception to the *Barnard* rule should only apply prospectively, i.e., not to Steenberg Homes. We disagree. We find Steenberg's contention that it relied on the *Barnard* rule misleading. Steenberg did not concede the intentional trespass until after the Jacques rested at trial. At this point, when overwhelming evidence clearly established Steenberg's intentional trespass on the Jacques' land, then and only then, did Steenberg rely on *Barnard* and concede intentional trespass. This

type of "reliance" does not give rise to the inequity that sunbursting is designed to prevent.

¶ 37. Steenberg's reliance on the *Barnard* rule is not the type of reliance that normally forms the basis for sunbursting. The court does not prospectively apply a holding merely because of reliance on an old rule. *Rolo v. Goers*, 174 Wis. 2d 709, 723, 497 N.W.2d 724 (1993). Prospective application of a holding based on reliance on an old rule has occurred when there has been reliance on an overruled decision by a substantial number of persons and considerable harm or detriment could result to them. *Id. See also Kojis v. Doctors Hospital*, 12 Wis. 2d 367, 107 N.W.2d 131, 107 N.W. 292 (1961) (abrogating charitable immunity); *Holytz v. Milwaukee*, 17 Wis. 2d 26, 115 N.W.2d 618 (1962) (abrogating governmental immunity); *Widell v. Holy Trinity Catholic Church*, 19 Wis. 2d 648, 121 N.W.2d 249 (1963) (abrogating immunity of religious entity). When tort law is changed, the court is concerned about exposing many individuals and institutions to liability who would have obtained liability insurance had they known they would no longer enjoy immunity. *Harmann*, 128 Wis. 2d at 381. Steenberg does not claim that others will be adversely affected by our recognition of an exception to the *Barnard* rule. Steenberg only refers to its own reliance, and to its own punishment.

¶ 38. The Jacques' interests also prevent us from sunbursting in this case. In determining whether hardship or injustice will occur, the court must also consider the effect of prospective application on the party who sought to change the law. Retroactivity is usually justified as a reward for the litigant who has persevered in attacking an unsound rule. To refuse to apply the new

rule here would deprive the Jacques of any benefit from their effort and expense in challenging the old rule which we now declare erroneous. That, we conclude, would be the greater injustice. Accordingly, we hold that the exception to *Barnard* that we recognize today shall be applied to Steenberg.

## IV.

¶ 39. Finally, we consider whether the jury's $100,000 punitive damage award to the Jacques is excessive. In this case, the circuit court, finding that the issue was moot, rejected Steenberg's motion for remittitur without review. Because we conclude that the nominal damages awarded to the Jacques support the jury's punitive damage award, and because we conclude that our holding today applies to Steenberg, the issue is not moot. Therefore, we review the $100,000 award to determine whether it is clearly excessive. We conclude that it is not. Accordingly, we do not order remittitur.

¶ 40. The award of punitive damages in a particular case is entirely within the discretion of the jury. Notwithstanding the jury's broad discretion, the circuit court has the power to reduce the amount of punitive damages to an amount that it determines is fair and reasonable. *Malco v. Midwest Aluminum Sales*, 14 Wis. 2d 57, 65, 109 N.W.2d 516 (1961). We are reluctant to set aside an award merely because it is large or we would have awarded less. *Fahrenberg v. Tengel*, 96 Wis. 2d 211, 236, 291 N.W.2d 516 (1980). A jury's punitive damage award will not be disturbed unless the verdict is so clearly excessive as to indicate passion and prejudice. *Fuchs v. Kupper*, 22 Wis. 2d 107, 125 N.W.2d 360 (1963). When we review the record to determine

whether a punitive damage award is excessive, the evidence must be viewed in the light most favorable to the plaintiff. *Fahrenberg*, 96 Wis. 2d at 231. A punitive damage award that is the product of a fair process is entitled to a strong presumption of validity. *TXO*, 509 U.S. at 457. Nonetheless, the Due Process Clause of the Fourteenth Amendment imposes substantive limits on the size of punitive damage awards. *Management Comp. Serv. v. Hawkins, Ash, Baptie*, 206 Wis. 2d 157, 557 N.W. 2d 67 (1996).

¶ 41. The Due Process Clause prohibits the court from imposing a " 'grossly excessive' " punishment on a tortfeasor. BMW of North America, Inc. v. Gore, 116 S.Ct. 1589, 1592 (1996) (quoting TXO Production Corp. v. Alliance Resources Corp., 509 U.S. 443, 454 (1993). The Due Process Clause dictates that an individual receive fair notice not only of the conduct that will subject him or her to punishment, but also of the severity of the penalty that a state may impose. Gore, 116 S.Ct. at 1598. Only when a punitive damage award can be fairly categorized as grossly excessive in relation to the State's legitimate interests in punishment and deterrence does it enter the zone of arbitrariness that violates the Due Process Clause. *Id.* at 1595.

¶ 42. The Supreme Court has recently clarified the three factors a court must consider when determining whether a punitive damage award violates the Due Process Clause: (1) the degree of reprehensibility of the conduct; (2) the disparity between the harm or potential harm suffered by the plaintiff and the punitive damage award; and (3) the difference between this remedy and the civil or criminal penalties authorized or imposed in comparable cases. Gore, 116 S.Ct. at 1598–99, 1603.

¶ 43.　We turn first to the reprehensibility factor. The most important indicium of the reasonableness of a punitive damage award is the degree of reprehensibility of the defendant's conduct. Punitive damages should reflect the egregiousness of the offense. *Id.* at 1599. In other words, some wrongs are more blameworthy than others and the punishment should fit the crime. In this case, the "crime" was Steenberg's brazen, intentional trespass on the Jacques' land.

¶ 44.　Steenberg's intentional trespass reveals an indifference and a reckless disregard for the law, and for the rights of others. At trial, Steenberg took an arrogant stance, arguing essentially that yes, we intentionally trespassed on the Jacques' land, but we cannot be punished for that trespass because the law protects us. We reject that position. We are further troubled by Steenberg's utter disregard for the rights of the Jacques. Despite numerous unambiguous refusals by the Jacques to allow Steenberg access to their land, Steenberg delivered the mobile home across the Jacques' land.

¶ 45.　Furthermore, these deceitful acts were egregious; Steenberg Homes acted deviously. After the conversation in the Jacques' kitchen, the Jacques, their neighbors, and the town chairman were satisfied that the matter was resolved, and Steenberg would not trespass on the Jacques' land. Nevertheless, the Steenberg employees testified that as they walked out of the Jacques' home, the assistant manager told them to use any means to deliver the mobile home. This conduct is reprehensible. We conclude that the degree of reprehensibility of Steenberg's conduct supports the imposition of a substantial punitive award.

¶ 46.　We now turn to the next factor in the Gore analysis: the disparity between the harm or potential

harm suffered by the Jacques and the punitive damage award. Gore, 116 S.Ct. at 1601.

¶ 47. In Management Computer Services, this court concluded that a reasonable relationship between the amount of compensatory damages, the potential criminal penalties, and the punitive damage award is required. Management Comp. Serv., 206 Wis. 2d at 193. This requirement combines the second and third Gore factors. We address them separately.

¶ 48. We have expressly rejected the use of a fixed multiplier, either a fixed ratio of compensatory to punitive damages or of criminal fine to punitive damages, to calculate the amount of reasonable punitive damages. *Id.* However, in the appropriate case, a comparison of the compensatory damages and the punitive award is important. While a constitutional line ought not be marked by a simple mathematical formula, the proportionate rule for punitive damages is one factor in determining the reasonableness of the punitive damage award. *Id.* See James D. Ghiardi, Punitive Damages in Wisconsin, 1977 Wis. L.Rev. 753, 771.

¶ 49. When compensatory damages are awarded, we consider the ratio of compensatory to punitive damages. This is so because compensatory damages represent the actual harm inflicted on the plaintiff. However, when nominal damages support a punitive damage award, use of a multiplier is of dubious assistance because the nominal damage award may not reflect the actual harm caused. If it did, the breathtaking 100,000 to 1 ratio of this case could not be upheld. However, in the proper case, a $1 nominal damage award may properly support a $100,000 punitive damage award where a much larger compensatory award might not. This could include situations where egre-

gious acts result in injuries that are hard to detect or noneconomic harm that is difficult to measure. In these instances, as in the case before us, a mathematical bright line between the constitutional and the unconstitutional would turn the concept of punitive damages on its head.

¶ 50. Finally, we turn to the third factor in the Gore analysis: we compare the punitive damage award and the civil or criminal penalties that could be imposed for comparable misconduct. Gore, 116 S.Ct. at 1603. Since punitive damages are assessed for punishment, it is relevant to compare the punitive damage award to the maximum fine in the section of the Wisconsin Criminal Code that contains a similar offense. Meke v. Nicol, 56 Wis. 2d 654, 664, 203 N.W.2d 129 (1973). A reviewing court engaged in determining whether a punitive damages award is excessive should accord " 'substantial deference' to legislative judgments concerning appropriate sanctions for the conduct at issue." Gore, 116 S.Ct. at 1603 (citation omitted).

¶ 51. We consider this factor largely irrelevant in the present case because the "conduct at issue" here was scarcely that contemplated by the legislative action. Steenberg received a citation for trespass to land under Wis. Stat. § 943.13, a Class B forfeiture. Wis. Stat. § 939.52(3)(b). Section 943.13(1)(b)provides that "[w]hoever. . . [e]nters or remains on any land of another after having been notified by the owner or occupant not to enter or remain on the premises" is subject to a Class B forfeiture. The maximum penalty for a Class B forfeiture is $1000. § 939.52(3)(b). Steenberg's egregious conduct could scarcely have been contemplated by the legislature when it enacted this statute which provides a penalty for simply "entering

or remaining" on the land of another. Here, not only did Steenberg Homes illegally enter and remain on the Jacques' land, first they plowed a path across the Jacques' field, then they transported a mobile home over the path. Furthermore, the statute failed to deter Steenberg's egregious misconduct. And we see no reason why the legislative penalty for simple trespass will deter future conduct by Steenberg. Without punitive damages, Steenberg has a financial incentive to trespass again.

¶ 52. Our concern for deterrence is guided by our recognition of the nature of Steenberg's business. Steenberg sells and delivers mobile homes. It is, therefore, likely that they will again be faced with what was, apparently for them, a dilemma. Should they trespass and pay the forfeiture, which in this case was $30? Or, should they take the more costly course and obey the law? Today we alleviate the uncertainty for Steenberg Homes. We feel certain that the $100,000 will serve to encourage the latter course by removing the profit from the intentional trespass.

¶ 53. Punitive damages, by removing the profit from illegal activity, can help to deter such conduct. In order to effectively do this, punitive damages must be in excess of the profit created by the misconduct so that the defendant recognizes a loss. It can hardly be said that the $30 forfeiture paid by Steenberg significantly affected its profit for delivery of the mobile home. One hundred thousand dollars will.

¶ 54. Finally, a substantial punitive damage award serves to assure that tort claims involving egregious conduct will be prosecuted. By allowing punitive damages, the self interest of the plaintiff might lead to prosecution of a claim that might not otherwise be pursued. A $100,000 punitive damage award will not only

631

give potential trespassers reason to pause before trespassing, it will also give aggrieved landowners reason to pursue a trespass action.

¶ 55. In sum, although actual harm and criminal penalties have some relevance to the amount of punitive damages and may be factors in determining the reasonableness of the punitive damage award, we have not been willing in the past, and are not willing in this case, to adopt a mathematical formula for awarding such damages. *Fahrenberg*, 96 Wis. 2d at 235–36. Our consideration of the *Gore* factors leads us to the conclusion that the $100,000 punitive damages award does not excessively punish Steenberg Homes for its egregious conduct, to deter it from trespassing again, and to deter others who might be similarly tempted. The punitive award neither shocks our conscience, nor takes our breath away. On the contrary, it is the brazen conduct of Steenberg Homes that we find shocking, not the $100,000 punitive damages award.

¶ 56. In conclusion, we hold that when nominal damages are awarded for an intentional trespass to land, punitive damages may, in the discretion of the jury, be awarded. Our decision today shall apply to Steenberg Homes. Finally, we hold that the $100,000 punitive damages awarded by the jury is not excessive. Accordingly, we reverse and remand to the circuit court for reinstatement of the punitive damage award.

*By the Court.*—Reversed and remanded with directions.