ANNETTE KINGSLAND ZIEGLER, J.
¶ 1. This is a review of an unpublished decision of the court of appeals, Kimble v. Land Concepts, Inc., No. 2011AP1514, unpublished slip op. (Wis. Ct. App. Oct. 11, 2012), affirming the judgment of the Door County Circuit Court,[1] upholding a jury award of punitive damages against First American Title Insurance Company ("First American").
¶ 2. First American argues that the punitive damages award against it was excessive and violated its right to due process under the United States and Wisconsin constitutions.[2]
¶ 3. John E. and Jane E. Stevenson ("Steven-sons")[3] argue that First American had no right to appeal the punitive damages award because it filed its post-verdict motion late. The Stevensons also argue that the award was reasonable in light of First American's bad faith conduct, and the harm that they *386 might have suffered as a result of that bad faith. The Stevensons further contend that punitive damages were appropriate because First American's conduct needed to be deterred.
¶ 4. We conclude that the punitive damages award in this case was excessive and deprived First American of its right to due process. We therefore reverse the court of appeals' decision and remand this case to the circuit court for entry of a judgment against First American in the amount of $239,738.49.
I. BACKGROUND FACTS
¶ 5. On October 26, 2004, Robert L. Kimble and Judith W Kimble ("Kimbles") purchased a lakefront lot located in the Town of Nasewaupee in Door County ("Kimble Lot") from Dorene Dempster ("Dempster") and Mark Herrell ("Herrell").[4] A private cut-off road that crossed the property immediately to the west provided access to the Kimble Lot. That property was owned by Land Concepts, Inc. ("Land Concepts").
¶ 6. The deed executed by Dempster and Herrell conveying the Kimble Lot to the Kimbles warranted that the property was benefitted by two easements. One easement purported to grant the Kimble Lot use of a private driveway connecting it to County Highway M across property to the north ("North Easement"). That private driveway had not been used in many years at the time of the sale. The other easement purported to grant the Kimble Lot access to County Highway M *387 across Land Concepts' property ("West Easement").[5] It is undisputed that the cut-off road was not within the boundaries of either of these easements.
¶ 7. On October 27, 2004, First American issued the Kimbles a title insurance policy for the Kimble Lot. The policy obligated First American to defend and indemnify the Kimbles for any covered loss, including losses resulting from "[u]nmarketability of the title" and "[l]ack of a right of access to and from the land." The policy did not insure any specific route of access.
¶ 8. In early 2008, the Kimbles listed their property for sale with a real estate agent.[6] On March 5, 2008, the Kimbles' agent received a letter from Land Concepts stating that the Kimbles "do not own — and cannot convey — any access rights to County Highway M" from the Kimble Lot. The letter instructed the agent to make prospective purchasers of the Kimble Lot aware of lack of access rights "[i]n order to avoid possible future misunderstandings and/or confusion." On March 17, 2008, the Kimbles' attorney contacted the Kimbles' local insurance agent, Marilyn DeNamur ("De-Namur"), about the dispute. DeNamur forwarded the matter to Donald Schenker ("Schenker"), an assistant vice president at First American.
¶ 9. On March 18, 2008, DeNamur provided Schenker with the deeds and other recorded documents purportedly granting the North and West Easements to the Kimbles' predecessors in title. In a follow-up message to Schenker on March 28, DeNamur noted that there appeared to be a problem with the deeds purport *388 ing to grant and convey the North Easement. DeNamur asked Schenker whether she should "continue to dig for more documentation?" Schenker never asked for more research.[7]
¶ 10. On March 31, 2008, Schenker, on behalf of First American, sent the Kimbles a letter which addressed the access issue. Schenker indicated in his letter that he believed the West Easement was defective.[8] Schenker asserted, however, that the North Easement continued to provide the Kimble Lot access to the highway, and because the title remained as insured, First American had no duty to intervene in the dispute. In his letter, Schenker described the chain of title he claimed supported the North Easement, but made no mention of the problems identified by DeNamur.
¶ 11. On May 27, 2008, the Kimbles forwarded Schenker a copy of a letter they intended to send to Land Concepts asserting their right to use the cut-off road. The Kimbles asked Schenker whether the letter jeopardized their title insurance policy. On May 28, 2008, Schenker assured the Kimbles that it did not, again implicitly asserting that another right of access existed.
¶ 12. On June 13, 2008, the Kimbles received a response letter from Land Concepts, wherein Land Concepts threatened to "close the access over [its] property" if the dispute was not "promptly resolved." On June 18, 2008, the Kimbles contacted Schenker regard *389 ing the threatened closure. The Kimbles asked Schenker whether First American would insure the North Easement under the title policy if the Kimbles constructed a new driveway following the route of that easement.
¶ 13. On June 25, 2008, Schenker reiterated to the Kimbles that their title policy did not insure any particular route of access. Schenker again asserted that the North Easement provided access and stated, "[w]hether there is some legal defense to prevent the Kimbles from using it, which falls under some exclusion or exception in the policy, we do not know." Schenker further recommended that the Kimbles have a survey of the North Easement performed before constructing any driveway.
¶ 14. The Kimbles continued to market their property throughout 2008, relying on Schenker's assurances that it had good access to the highway. Land Concepts continued to dispute the Kimbles' right of access, but did not follow through on its threat to physically close the cut-off road.
¶ 15. On January 12, 2009, the Bumbles received a cash offer to purchase their property. The sale was made contingent on the access issue being resolved. Despite an extension on the original 30-day time limit, the Kimbles were unable to negotiate a resolution with Land Concepts and lost the sale.
II. PROCEDURAL POSTURE
¶ 16. On June 3, 2009, the Kimbles filed suit against Land Concepts and the Stevensons. The Kimbles sought a declaration that the North Easement was valid and sought a prescriptive easement for their *390 use of the cut-off road. The Kimbles also claimed that Land Concepts, in recording the West Easement, had slandered the title to the Kimbles' property.
¶ 17. On October 23, 2009, the Kimbles amended their complaint adding breach of warranty claims against Dempster, Herrell, and the Stevensons, and a breach of contract claim against First American for failing to defend the title to their property.
¶ 18. On July 21, 2010, the Kimbles settled their claims against all the defendants except First American. As part of the settlement, the Kimbles and the Stevensons paid Land Concepts $40,000 to secure an easement over the route of the existing cut-off road. The Stevensons paid an additional $10,000 to the Kimbles for an assignment of the Kimbles' rights under the title insurance policy, including any claims against First American.
¶ 19. On August 6, 2010, the Stevensons filed a cross-claim against First American, alleging breach of contract and breach of fiduciary duty and bad faith in First American's refusal to defend the title to the Kimble Lot.
¶ 20. On December 1, 2010, First American filed a motion for declaratory and summary judgment, asking the court to dismiss the Stevensons' cross-claim. First American argued that the Stevensons were not "insureds," and thus had no rights under the title policy. First American also contended that the Kimbles were not permitted to settle their claims against other defendants without the written consent of First American. First American asserted that the title policy was void as a result.
¶ 21. The Stevensons argued that the Kimbles were permitted to assign their rights under the title policy, and that the partial settlement was proper under *391 the terms of the insurance contract. The Stevensons also asserted that, to the extent summary judgment was warranted, it should be granted against First American on the Stevensons[1] breach of contract claim.
¶ 22. On January 18, 2011, the circuit court denied First American's motion for declaratory and summary judgment. The court concluded that the assignment of rights from the Kimbles to the Stevensons was proper and that there were issues of fact to be tried regarding the Stevensons' breach of contract and breach of fiduciary duty and bad faith claims.
¶ 23. On February 4, 2011, the Stevensons filed a motion in limine which asked the court to exclude any evidence of the monetary terms of the settlement agreements between the Kimbles and the other defendants.
¶ 24. On February 21, 2011, First American filed a motion in limine asking the court to exclude evidence that the Kimbles' title was unmarketable as a result of the access problems. First American argued that, while the access issues might have impaired the value of the property, they did not constitute a defect in the title.
¶ 25. On March 1, 2011, the circuit court granted the Stevensons' motion in limine to exclude evidence of the terms of the settlement between the Kimbles and the other defendants. Additionally, the circuit court denied First American's motion in limine to exclude evidence of unmarketability. In denying First American's motion, the court determined that the issue of marketability was a legal question to be determined by the court prior to trial. The court concluded that title to the Kimble Lot was rendered unmarketable by the access dispute. As a result, the court concluded that coverage was triggered under the title insurance policy. The court determined that it was for the jury to decide *392 whether First American's decision not to defend the Kimbles under the policy constituted breach of contract and breach of fiduciary duty and bad faith.
¶ 26. On March 2, 2011, the jury trial began. At trial, the Stevensons presented evidence that First American was obligated to defend the Kimbles' title and failed to do so. The Stevensons further presented evidence that First American knew the North Easement was defective and concealed that information from the Kimbles. First American presented evidence that it had a good faith belief that the North Easement provided access, and that as a result, its failure to disclose the defect to the Kimbles was merely a mistake.[9]
¶ 27. On March 3, 2011, the jury returned a verdict in favor of the Stevensons. The jury found that First American breached its contract and exercised bad faith in refusing to defend the Kimbles' title. The jury awarded the Stevensons $50,000 in compensatory damages for the breach of contract, and $1,000,000 in punitive damages to punish First American's bad faith.
¶ 28. On March 24, 2011, First American filed three motions after the verdict with the circuit court.[10] Initially, First American asked the court, pursuant to Wis. Stat. § 805.14(5)(c), to reduce the compensatory damages award. Next, First American asked the court to change the jury's answer to the bad faith question to *393 "no" and delete the jury's punitive damages award. First American asserted that there was insufficient evidence supporting the findings. Finally, First American asked the court, in the alternative, to set aside the punitive damages award, which First American argued was excessive, and order a new trial on damages.
¶ 29. The Stevensons opposed First American's post-verdict motions. The Stevensons argued that the jury's award was appropriate, and that First American's conduct justified punitive damages. Further, the Stevensons argued that the jury's punitive damages award was not excessive.
¶ 30. On June 14, 2011, the circuit court granted First American's motion regarding the compensatory damages award, reducing it to $29,738.49. The court denied First American's other motions, however, allowing the bad faith finding and the punitive damages award to stand. The court then entered judgment against First American in the amount of $1,029,738.49.
¶ 31. On June 29, 2011, First American filed its notice of appeal. On July 11, 2011, First American filed a motion with the circuit court requesting the court stay the effect of the judgment pending appeal. On August 3, 2011, the circuit court granted First American's motion.
¶ 32. Before the court of appeals, First American made four arguments. First, it argued that the Kimbles were not permitted to assign their rights under the title insurance policy to the Stevensons. Second, First American argued that the circuit court improperly determined that coverage under the policy was invoked prior to trial. Third, First American argued that there was insufficient evidence to support the jury's finding of *394 bad faith. Finally, First American argued that the punitive damages award was excessive.[11]
¶ 33. The Stevensons argued that the Kimbles' assignment of their rights under the insurance policy was valid, and that the circuit court properly found coverage under the title policy as a matter of law. The Stevensons also contended that First American's conduct supported the jury's finding of bad faith, and that the punitive damages award was not excessive.
¶ 34. On October 11, 2012, the court of appeals affirmed the circuit court. Kimble, No. 2011AP1514, slip op., ¶ 1. First, the court of appeals concluded that the Kimbles were permitted to assign their rights under the title policy to the Stevensons, and that they had not violated the terms of the policy in agreeing to a partial settlement. Id., ¶¶ 16-17. Second, the court of appeals affirmed the circuit court's determination that, as a matter of law, there was coverage under the title policy. Id., ¶¶ 24-28. Third, the court appeals affirmed the circuit court's determination that the jury's finding of bad faith was supported by sufficient evidence. Id., ¶¶ 33-35. Finally, the court of appeals summarily affirmed the jury's punitive damages award, finding First American's argument regarding excessiveness of the award to be "insufficiently developed." Id., ¶ 41.[12]
*395 ¶ 35. On December 28, 2012, First American petitioned this court for review, which we granted on July 18, 2013.[13]
¶ 36. On September 3, 2013, the Stevensons filed a motion for summary disposition in this court, arguing that by filing its post-verdict motion late, First American had waived its right to appellate review. See Wis. Stat. §§ 805.14(5) and 805.15(1). We held the motion in abeyance.[14]
III. STANDARD OF REVIEW
¶ 37. "[T]he constitutional issue of punitive damages merits de novo review." Trinity Evangelical Lutheran Church & Sch.-Freistadt v. Tower Ins. Co., 2003 WI 46, ¶ 47, 261 Wis. 2d 333, 661 N.W.2d 789 (citing Cooper Indus., Inc. v. Leatherman Tool Grp., Inc., 532 U.S. 424, 431 (2001)). "[I]n determining whether a jury's award [is] excessive,. . . the reviewing court properly review[s] the entire record 'ab [initio]'. . . ." Id., ¶ 48 *396 (citing Mgmt. Computer Servs. v. Hawkins, Ash, Baptie & Co., 206 Wis. 2d 158, 192 n.32, 557 N.W.2d 67 (1996)).
¶ 38. We recognize that our prior case law, particularly Jacque v. Steenberg Homes, Inc., 209 Wis. 2d 605, 563 N.W.2d 154 (1997), has created confusion with respect to the standard of review in punitive damages cases. Jacque, however, predates both Cooper, wherein the United States Supreme Court clarified that de novo is the appropriate standard of review, and Trinity, wherein this court explicitly adopted that standard. While judges "serve as gatekeepers before sending a question on punitive damages to the jury," Strenke v. Hogner, 2005 WI 25, ¶ 40, 279 Wis. 2d 52, 694 N.W.2d 296,[15] once the issue of punitive damages is properly before the jury, its decision to award punitive damages is accorded deference. The size of the award, however, is subject to de novo review to ensure it accords with the constitutional limits of due process. Trinity, 261 Wis. 2d 333, ¶¶ 47-49.
IV ANALYSIS
A. Post-Verdict Motion
¶ 39. As an initial matter we address the argument, raised by the Stevensons in their motion for summary disposition, that First American lost its right to appeal the punitive damages award when it failed to timely file its post-verdict motion under Wis. Stat. § 805.16(1).
*397 ¶ 40. Wisconsin Stat. § 805.16(1) provides that "[mjotions after verdict shall be filed and served within 20 days after the verdict is rendered, unless the court, within 20 days after the verdict is rendered, sets a longer time by an order specifying the dates for filing motions, briefs or other documents." Further, a litigant's failure to comply with the statute causes "the circuit court [to] 'los[e] competency to exercise its jurisdiction.'" Hartford Ins. Co. v. Wales, 138 Wis. 2d 508, 513, 406 N.W.2d 426 (1987) (quoting Jos. P. Jansen v. Milwaukee Area Dist. Bd., 105 Wis. 2d 1, 10, 312 N.W.2d 813 (1981)).
¶ 41. The circuit court's inability to consider a post-verdict motion, however, does not deprive this court of appellate jurisdiction. Failure to comply with Wis. Stat. § 805.16 "limit[s] the issues that may be asserted as a matter of right on the appeal. . .." Wales, 138 Wis. 2d at 510-511. "A trial court's failure to conform with sec. 805.16, Stats., however, does not strip this court of its discretionary power[]" to review the case. Brandner v. Allstate Ins. Co., 181 Wis. 2d 1058, 1071, 512 N.W.2d 753 (1994).
¶ 42. The merits issue in this case is of constitutional dimension and has been fully briefed and argued by both parties. We therefore exercise our discretion and address whether the punitive damages award against First American was unconstitutionally excessive.
*398 B. Punitive Damages Award
¶ 43. Punitive damages are not intended to compensate the plaintiff, but rather are awarded "to punish the wrongdoer, and to deter the wrongdoer and others from similar conduct." Trinity, 261 Wis. 2d 333, ¶ 50. "Punitive damages may properly be imposed to further a State's legitimate interests in punishing unlawful conduct and deterring its repetition." BMW of N. Am., Inc. v. Gore, 517 U.S. 559, 568 (1996).[16]
¶ 44. In Wisconsin, punitive damages are authorized by statute, see Wis. Stat. § 895.043, and may be awarded "if evidence is submitted showing that the defendant acted maliciously toward the plaintiff or in an intentional disregard of the rights of the plaintiff." Wis. Stat. § 895.043(3). The judge has the duty to act as the "gatekeeper" when determining whether the issue of punitive damages is properly before the jury. Strenke, 279 Wis. 2d 52, ¶ 40. Once the judge has determined that the issue of punitive damages is properly before the jury, whether to actually award punitive damages "in a particular case is entirely within the discretion of the jury." Jacque, 209 Wis. 2d at 626. Both the judicial determination regarding whether punitive damages is a proper jury question and the size of the jury's punitive *399 damages award are subject to review. The Due Process Clause of the Fourteenth Amendment "imposes substantive limits on the size of a punitive damages award." Trinity, 261 Wis. 2d 333, ¶ 49 (citing Mgmt. Computer Servs., 206 Wis. 2d at 193).[17]
¶ 45. A punitive damages award "is excessive, and therefore violates due process, if it is more than necessary to serve the purposes of punitive damages, or inflicts a penalty or burden on the defendant that is disproportionate to the wrongdoing." Trinity, 261 Wis. 2d 333, ¶ 50. "Elementary notions of fairness enshrined in our constitutional jurisprudence dictate that a person receive fair notice not only of the conduct that will subject him to punishment, but also of the severity of the penalty that a State may impose." BMW, 517 U.S. at 574; see also Trinity, 261 Wis. 2d 333, ¶ 51.
¶ 46. The United States Supreme Court has applied a three-part test to determine whether an award of punitive damages is excessive. See BMW, 517 U.S. at 574-75; State Farm Mut. Auto Ins. Co. v. Campbell, 538 U.S. 408 (2003). This test asks the reviewing court to weigh: "(1) the degree of egregiousness or reprehensibility of the conduct; (2) the disparity between the harm *400 or the potential harm suffered and the punitive damages award; and (3) the difference between the punitive damages and the possible civil or criminal penalties imposed for the conduct." Trinity, 261 Wis. 2d 333, ¶ 52 (citing BMW, 517 U.S. at 575).
¶ 47. Wisconsin case law calls on courts to apply a substantively identical test applying six factors rather than three:
1. The grievousness of the acts;
2. The degree of malicious intent;
3. Whether the award bears a reasonable relationship to the award of compensatory damages;
4. The potential damage that might have been caused by the acts;
5. The ratio of the award to civil or criminal penalties that could be imposed for comparable misconduct; and
6. The wealth of the wrongdoer.
Trinity, 261 Wis. 2d 333, ¶ 53; Mgmt. Computer Servs., 206 Wis. 2d at 194. Wisconsin courts are called upon to analyze only "those factors which are most relevant to the case, in order to determine whether a punitive damages award is excessive."[18] Id.
*401 1. Reprehensibility
¶ 48. " '[T]he most important indicium of the reasonableness of a punitive damage [s] award is the degree of reprehensibility of the defendant's conduct.'" Trinity, 261 Wis. 2d 333, ¶ 57 (quoting Jacque, 209 Wis. 2d at 628). "This principle reflects the accepted view that some wrongs are more blameworthy than others." BMW, 517 U.S. at 575.
¶ 49. In Campbell, the Supreme Court explained the standard courts should apply in determining the reprehensibility of a defendant's conduct:
We have instructed courts to determine the reprehensibility of a defendant by considering whether: the harm caused was physical as opposed to economic; the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; the target of the conduct had financial vulnerability; the conduct involved repeated actions or was an isolated incident; and the harm was the result of intentional malice, trickery, or deceit, or mere accident. The existence of any one of these factors weighing in favor of a plaintiff may not be sufficient to sustain a punitive damages award; and the absence of all of them renders any award suspect.
538 U.S. at 419 (citation omitted); see also BMW, 517 U.S. at 576-77.
¶ 50. Turning to the case at issue, we must acknowledge that First American's conduct in the case at issue is reprehensible. First American knew that the North Easement did not provide access to the Kimble Lot and that there was no reasonable alternative access point, and yet refused to honor its obligation to assist *402 the Kimbles in defending their title. First American further withheld the information it had in its possession from the Kimbles, causing them to waste valuable time and resources. These circumstances support an award of punitive damages.[19] The question, however, is whether the degree of reprehensibility supports the punitive damages actually awarded.
¶ 51. In that regard, it is noteworthy that none of the reprehensibility factors identified by the Supreme Court in Campbell are present in this case. The damage suffered by the Bumbles was indisputably economic, not physical. First American's bad faith did not endanger the health or safety of any person. There is no indication in the record that the Kimbles were financially vulnerable.[20] The conduct complained of was an isolated incident. And while First American's conduct indisputably involved deception, there is no indication of intentional malice on the part of the company or its employees. The punitive damages award against First American is therefore suspect. Campbell, 538 U.S. at 419.
¶ 52. Further, the degree of reprehensibility in this case falls short of that found in prior Wisconsin cases supporting substantial punitive damages awards.
*403 ¶ 53. For example, in Trinity, the insurance company defendant denied a claim based on an omission in coverage, despite knowing that the omission in the policy was the result of its own error. 261 Wis. 2d 333, ¶¶ 7-8. This court held that the insurance carrier not only "engaged in prohibited conduct while knowing or recklessly disregarding the lack of a reasonable basis for denying the claim," but further was a recidivist, having previously been the subject of a lawsuit involving precisely the same kind of conduct. Id., ¶¶ 57-59. These facts allowed the defendant to be subjected to a more severe punitive damages award without offending due process: $3,500,000 in a case where only $490,000 in harm or potential harm had been established.[21] Id.
¶ 54. Here, there is no indication from the record that First American engaged in repeated conduct. Neither does the record support any finding of malicious intent. First American's conduct, while "sufficiently reprehensible to give rise to tort liability, and even a modest award of exemplary damages does not establish the high degree of culpability that warrants a substantial punitive damages award." BMW, 517 U.S. at 580.
2. Disparity
¶ 55. "When compensatory damages are awarded, the reviewing court is to consider whether the [punitive damages] award bears a reasonable relationship to the *404 award of compensatory damages." Trinity, 261 Wis. 2d 333, ¶ 63. "Wisconsin law expressly rejects the use of a fixed multiplier, either a fixed ratio of compensatory to punitive damages or of civil or criminal penalties to punitive damages, to calculate the amount of reasonable punitive damages." Id. (citations omitted). "However, we have held that in the appropriate case, a comparison of the compensatory damages and the punitive damages award is important." Id. (citing Jacque, 209 Wis. 2d at 629).
¶ 56. In the case at issue, the compensatory damages ultimately awarded were $29,738.49. Using the compensatory damages award as a baseline thus represents a ratio of approximately 33:1. Such a ratio is transparently problematic under the United States Constitution.
¶ 57. The Supreme Court, however, has declared that reviewing courts can consider not only the compensatory damages award, but also " 'the harm likely to result from the defendant's conduct.'" BMW, 517 U.S. at 581 (quoting TXO Prod. Corp. v. Alliance Res. Corp., 509 U.S. 443, 460.(1993)). Similarly, where it is relevant and appropriate, our prior case law supports consideration of "potential damage" that might have been caused by a defendant's acts. Trinity, 261 Wis. 2d 333, ¶ 53.
¶ 58. The Stevensons argue that the appropriate figure to use in assessing the disparity, in light of the sale the Kimbles lost during the dispute, is the full $1,300,000 sale price of the Kimbles' home. We disagree. The Stevensons can point to no indication in the record that the full value of the Kimbles' property was ever in *405 danger.[22] Case law does not support this type of speculative "potential damage," particularly where it is unsupported by the record.
¶ 59. For example, in TXO, the petitioner fraudulently attempted to undermine the title to a tract of land in order to avoid paying royalties for oil and gas extraction. 509 U.S. at 448-50. The respondent received a judgment for common law slander of title in its favor, including $19,000 in compensatory damages and $10,000,000 in punitive damages. Id. at 453. Petitioner appealed, arguing that the 526:1 ratio of compensatory to punitive damages rendered the award unconstitutionally excessive. Id. A plurality of the Supreme Court held that, in addition to the compensatory damages award, it was appropriate to consider the "between $5 million and $8.3 million" in lost royalties that the respondent would have suffered had petitioner's plan succeeded. Id. at 460-61.
¶ 60. Similarly, in Trinity, this court accepted that the appropriate figure for comparison was not the $17,000 compensatory damages award, but rather was the $490,000 in potential damages at risk in the underlying negligence suit.
¶ 61. Notably, the "potential harm" in both of these cases is grounded in record and is not merely speculative. Had the plaintiff in Trinity lost its case, $490,000 was the amount it would have had to pay. Had the petitioner's scheme in TXO succeeded, it was undisputed that the respondent would have been deprived *406 of millions of dollars in royalties. These analyses were firmly rooted in fact, and the amounts in question were derived from the record.
¶ 62. Here, the Stevensons invite this court to depart from the facts of the record and speculate that, had the Kimbles failed to discover First American's bad faith, they would have been completely unable to sell their property, rendering it valueless. We decline this invitation. Many factors enter into a completed sale of real estate, and to attribute full responsibility for the lost sale to First American is highly speculative. There is no elegir indication in the record of what impact the access dispute had on the value of the Kimbles' property.
¶ 63. We share Justice Kennedy's concern that, without a meaningful standard, a court can end up "relying upon nothing more than its own subjective reaction to a particular punitive damages award in deciding whether the award violates the Constitution." TXO, 509 U.S. at 466-67 (Kennedy, J, concurring).
¶ 64. Fortunately, there is no need to speculate about potential harm, or to rely on subjective reactions, in order to appropriately assess the disparity in this case. The record reveals that the Kimbles spent $40,000 to purchase the access to their property that their title policy was supposed to insure.[23] Given that the compensatory damages award merely accounted for legal expenses, it is appropriate to add the compensatory damages together with the cost of purchasing the access *407 for purposes of assessing the disparity of the punitive damages award. This $69,738.49 figure, however, still represents a problematic ratio of approximately 14:1.
¶ 65. "[I]n practice, few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process." Campbell, 538 U.S. at 425. Even a punitive damages award of just four times compensatory damages can come " 'close to the line'" of violating due process. BMW, 517 U.S. at 581 (quoting Pac. Mut. Life Ins. Co. v. Haslip, 499 U.S. 1, 23 (1991)).[24]
¶ 66. In the case at issue, there are no special circumstances calling for a high ratio punitive damages award. This becomes especially apparent when the conduct here is compared to other cases where courts have upheld high ratio awards. See, e.g., Trinity, 261 Wis. 2d 333; J.K. v. Peters, 2011 WI App 149, 337 Wis. 2d 504, 808 N.W.2d 141 (upholding a high ratio punitive damages award against a social worker who sexually assaulted his minor client); Strenke v. Hogner, 2005 WI App 194, 287 Wis. 2d 135, 704 N.W.2d 309 (upholding a high ratio punitive damages award against a drunk driver who caused substantial injuries to another motorist).[25] These prior cases involve the kind of especially egregious conduct identified by the Su *408 preme Court in Campbell, including "physical as opposed to economic" harm, and "indifference to or a reckless disregard of the health or safety of others." 538 U.S. at 419. As we have discussed, the case at issue does not involve such conduct.
¶ 67. In sum, the award in this case does not bear a "reasonable relationship" to either the compensatory damages award or the potential harm faced by the Kimbles. We conclude, therefore, that the award does not comport with due process.
3. Civil or Criminal Penalties
¶ 68. Finally, "we engage in a comparison of the punitive damages award and the civil or criminal penalties that could be imposed for comparable misconduct." Trinity, 261 Wis. 2d 333, ¶ 66 (citing Jacque, 209 Wis. 2d at 630). In this case, as in Trinity, First American could be subject to a criminal penalty, including a fine of up to $10,000, for the violation of "any insurance statute or rule of this state." Wis. Stat. § 601.64(4). The Stevensons argue that First American violated Wis. Admin. Code § Ins. 6.11(3)(a), which prohibits unfair settlement practices.
¶ 69. In this case we conclude, as we did in Trinity, that "a criminal penalty has 'less utility' when used to determine the dollar amount of the punitive damages award." 261 Wis. 2d 333, ¶ 68 (citing Campbell, 538 U.S. at 428). We nonetheless note that "[t]he existence of a criminal penalty does have bearing on the seriousness with which a State views the wrongful action." Id., ¶ 66 (quoting Campbell, 538 U.S. at 428).
*409 4. Application
¶ 70. Applying the relevant factors to the case at issue, we conclude that the punitive damages award against First American is excessive. First, First American's conduct "is sufficiently reprehensible to give rise to tort liability, and even a modest award of exemplary damages does not establish the high degree of culpability that warrants a substantial punitive damages award." BMW, 517 U.S. at 580. Second, there is no especially egregious conduct supporting a high ratio punitive damages award. Absent such egregious conduct, even the 7:1 ratio imposed in Trinity would be unconstitutionally excessive. Finally, the existence of an additional civil or criminal penalty has "limited utility" in determining the reasonableness of the punitive damages award.[26] See Trinity, 261 Wis. 2d 333, ¶ 68.
¶ 71. We conclude, in consideration of the case law, that the appropriate amount of punitive damages in this case is $210,000. Comparing the amount of this award to the $69,738.49 amount of compensatory and potential damages results in a ratio of approximately 3:1, below the ratio we upheld in Trinity, and just below *410 the constitutional "line" mentioned by the Supreme Court in BMW, 517 U.S. at 581, and Haslip, 499 U.S. at 23. Because "[t]he precise award in any case, of course, must be based upon the facts and circumstances of the defendant's conduct and the harm to the plaintiff," Campbell, 538 U.S. at 425, we conclude that this amount effectively punishes First American's misconduct, while acknowledging that its conduct did not rise to level of egregiousness found in prior punitive damages cases.
V CONCLUSION
¶ 72. We conclude that the punitive damages award in this case was excessive and deprived First American of its right to due process. We therefore reverse the court of appeals' decision and remand this case to the circuit court for entry of judgment against First American in the amount of $239,738.49.
By the Court. — The decision of the court of appeals is reversed, and the cause is remanded to the circuit court.
¶ 73. DAVID T. PROSSER, J., did not participate.

 The Honorable D. Todd Ehlers presided.

 First American's petition for review addressed four issues. We granted review, however, solely on the issue of whether the punitive damages award was unconstitutionally excessive.

 The original plaintiffs in this action, Robert L. Kimble and Judith W Kimble, assigned their rights under their title insurance policy, including any claims against First American, to the Stevensons as part of a settlement agreement.

 Dempster and Herrell had originally purchased the lot from the Stevensons. All were initially defendants in the Kimbles' lawsuit.

 The West Easement traversed property belonging only to Land Concepts, while the North Easement traversed property belonging to both Land Concepts and other owners.

 The precise date of the real estate listing is not a part of the record.

 The record is devoid of any direct response from Schenker to DeNamur's March 28, 2008 e-mail message.

 Specifically, Schenker wrote that the document recording the easement failed to identify the property benefitted, and thus failed to comply with Wis. Stat. § 706.02(1) (2009-10). All subsequent references to the Wisconsin Statutes are to the 2009-10 version unless otherwise indicated.

 As we have granted review only on the legal issue of whether the punitive damages award in this case was excessive, this opinion does not provide a detailed description of the arguments presented at trial. The evidence in the record is assumed to be sufficient to support the jury's findings in all respects except the size of the punitive damages award.

 The Stevensons argue that First American waived its right to appeal the punitive damages award by filing its post-verdict motions late. See Wis. Stat. § 805.16(1). We address this argument in part IV(A) of this opinion.

 First American also argued that the compensatory damages award should be further reduced. Because this argument was not raised in First American's post-verdict motion, however, the court of appeals declined to address the issue. Kimble v. Land Concepts, Inc., No. 2011AP1514, unpublished slip op., ¶ 37 (Wis. Ct. App. Oct. 11, 2012) (citing Segall v. Hurwitz, 114 Wis. 2d 471, 489, 339 N.W.2d 333 (Ct. App. 1983)).

 Given that the availability of" 'meaningful and adequate review by the trial court' and subsequent appellate review" of punitive damages awards is necessary to ensure that such awards are not imposed in an arbitrary manner, see Honda *395 Motor Co., Ltd. v. Oberg, 512 U.S. 415, 420 (1994), the court of appeals' lack of analysis is remarkable. We take this opportunity to remind courts, both trial and appellate, of their obligation to ensure that punitive damages awards comply with due process.

 Because we granted review solely on the issue of whether the punitive damages award was excessive, this opinion assumes, without deciding, that the assignment was valid, that there was coverage under the insurance policy, and that the jury's finding of bad faith was supported by the evidence.

 In response to the Stevensons' motion for summary disposition, First American filed a motion to supplement the record, purporting to show that its post-verdict motion was filed timely, and a motion to strike the Stevensons' reply brief on the motion for summary disposition. The motion for summary disposition, as well as these additional motions are rendered moot by our decision and thus are not addressed.

 Strenke v. Hogner interpreted Wis. Stat. § 895.85(3) (2001-02), the predecessor to the current punitive damages statute. 2005 WI 25, ¶ 2, 279 Wis. 2d 52, 694 N.W.2d 296; see also Wis. Stat. § 895.043(3).

 Because punitive damages serve the State's interests, rather than serving to compensate a party, punitive damages awards do not implicate a plaintiffs right to a remedy or to a jury trial. See Wis. Const, art. I, §§ 5 and 9; compare Ferdon ex rel. Petrucelli v. Wis. Patients Comp. Fund, 2005 WI 125, ¶ 69, 284 Wis. 2d 573, 701 N.W.2d 440 (suggesting that a statutory cap on noneconomic compensatory damages might implicate a plaintiffs right to a jury trial and to a remedy under the Wisconsin Constitution).

 We have previously stated that "the evidence must be viewed in the light most favorable to the plaintiff, and a jury's punitive damages award will not be disturbed, unless the verdict is so clearly excessive as to indicate passion and prejudice." Trinity, 261 Wis. 2d 333, ¶ 56; Jacque, 209 Wis. 2d at 626-27. Given that punitive damages awards mandate de novo review, see Trinity, 261 Wis. 2d 333, ¶ 47, this language should not be read to require deference to the amount of the jury's award. Rather, stating that an award is "so clearly excessive as to indicate passion and prejudice" is simply another way of referring to an award that violates due process.

 While Wisconsin courts are free to apply these six factors flexibly, based upon their relevancy to a given case, they should be analyzed in conjunction with the three constitutional "guideposts" described by the Supreme Court in BMW of N. Am., Inc. v. Gore, 517 U.S. 559, 575 (1996). The factors are not intended to supplant the test mandated by the Constitution.

 The failure of an insurer to diligently investigate before denying a claim and concealing material information from an insured clearly meet this standard. See, e.g., Trinity, 261 Wis. 2d 333, ¶ 62.

 While Judith Kimble testified at trial that a dire financial situation faced by her elderly parents caused the Kimbles to reduce their asking price and be "more aggressive" in selling their home, the record does not contain any indication that the Kimbles themselves were in any financial trouble.

 " '[O]ur holdings that a recidivist may be punished more severely than a first offender recognize that repeated misconduct is more reprehensible than an individual instance of malfeasance.'" Trinity, 261 Wis. 2d 333, ¶ 58 (quoting Campbell, 538 U.S. at 423).

 On December 26, 2013, the Stevensons filed a motion to supplement the record hy judicial notice, asking this court to take into account the eventual sale price of the Kimbles' home. We deny that motion. The supplemental information was not part of the record before the trial court.

 Although this evidence was not before the jury at trial, it was before the circuit court and was made a part of the record on appeal. We may, therefore, properly consider it in "review-ting] the entire record 'ab [initio]'... ." Trinity, 261 Wis. 2d 333, ¶ 48.

 Additionally, the Wisconsin Legislature recently enacted a law limiting punitive damages awards. See 2011 Wis. Act 2 § 23m. The new statute caps punitive damage awards at a 2:1 ratio of compensatory damages or $200,000, whichever is greater. Wis. Stat. § 895.043(6) (2011-12). While the statute is not applicable to this case, it is nonetheless appropriate to consider the legislature's judgment of a reasonable disparity of punitive to compensatory damages.

 The court of appeals upheld the damages award in Strenke on remand from this court. This court was equally *408 divided on the question of whether the award of punitive damages was excessive. See Strenke, 279 Wis. 2d 52, ¶ 58.

 We note here, as we did in Trinity that "[t]he factors discussed are the ones most relevant in this case ... [and] there are other factors that may be relevant given the nature of the case at hand." 261 Wis. 2d 333, ¶ 69. In particular, we note that while the " [defendant's wealth is oftentimes a significant factor," id., it is not significant in this case. The record indicates First American would likely be able to pay the amount specified by the jury. Standing alone, however, the "wealth of a defendant cannot justify an otherwise unconstitutional punitive damages award." State Farm Mut. Auto Ins. Co. v. Campbell, 538 U.S. 408, 427 (2003) (citing BMW, 517 U.S. at 585).

 Majority op., ¶ 48.