COURT OF APPEALS
DECISION
DATED AND FILED

August 5, 2021

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2020AP895**

Cir. Ct. No. **2019CV242**

STATE OF WISCONSIN

IN COURT OF APPEALS
DISTRICT IV

CHRISTOPHER HOOKSTEAD,

   PLAINTIFF-APPELLANT,

 V.

GARY BEAL AND PERI BEAL,

   DEFENDANTS-RESPONDENTS.

APPEAL from a judgment and an order of the circuit court for Dodge County: JOSEPH G. SCIASCIA, Judge. *Affirmed*.

Before Blanchard, P.J., Graham, and Nashold, JJ.

¶1 BLANCHARD, P.J. Christopher Hookstead filed an adverse possession claim for title to a strip of land that separates his property from property held by Gary and Peri Beal. This claim was tried to a jury, along with counterclaims made by the Beals for common law trespass and conversion as well

as a counterclaim pursued under WIS. STAT. § 895.446(1) (2019-20) for property damage caused by a crime.[1] The jury found in the Beals' favor on all issues. This included awarding the Beals punitive damages of $250,000, which the circuit court reduced to $200,000. Hookstead appeals the judgment and the circuit court's order denying his post-verdict motions for a new trial or in the alternative to reduce the punitive damages award. We affirm all of the challenged circuit court decisions.

¶2       Hookstead argues that the circuit court should not have rejected his request to give the jury a special verdict question that would have distinguished one portion of the disputed property from another. We conclude that the court did not erroneously exercise its discretion in making this decision. This is because Hookstead made this request for the first time after the close of evidence at trial and the court could reasonably conclude that, up to that point, Hookstead had made only an all-or-nothing adverse possession claim, and had not claimed entitlement to just a portion of the disputed property.

¶3       Regarding some of the Beals' counterclaims for "property damage or loss caused by crime," Hookstead argues that the circuit court erred in rejecting Hookstead's request to apply the two-year statute of limitations in WIS. STAT. § 893.93(2)(a), which governs actions "by a private party upon a statute penalty." Construing § 893.93(2)(a) narrowly, we conclude that a civil action under WIS. STAT. § 895.446(1) is not an action "by a private party upon a statute penalty."

---

[1] All references to the Wisconsin Statutes are to the 2019-20 version unless otherwise noted.

¶4    Regarding the punitive damage award, Hookstead argues that the circuit court erred in ruling that the amount awarded did not violate the due process clause. We agree with the circuit court on this issue.

**BACKGROUND**

¶5    At all relevant times, Hookstead or his predecessor in interest owned farmland that shared a border with farmland owned by the Beals.[2] Pertinent here, Hookstead and the Beals each owned two nearly square parcels separated by a boundary area that they disputed. The boundary area ran roughly north-south. The northwest and southwest parcels belonged to Hookstead. The northeast and southeast parcels belonged to the Beals. We refer to the disputed portions of these four parcels along their north-south boundaries as the "disputed property."

¶6    The disputed property ran north-south approximately one-half mile, and east-west between five and twenty-four feet. Its eastern edge lay along the approximate center of a tree line that separated land used by the parties and their predecessors to grow crops. Its western edge was defined by a survey line that the parties agree accurately reflects the legal descriptions of the two western parcels.

¶7    Hookstead's consistent position has been that the eastern edge of the disputed property should be recognized as the boundary between his parcels and the Beals' parcels because, through the actions of himself and his predecessors, he adversely possessed all land between the survey line and this eastern edge, *i.e.,* the approximate center of the tree line. The Beals argue that the survey line marks the

---

[2] At least at some pertinent times, the northeast parcel was owned by a trust. However, there is no dispute that, at all pertinent times, the Beals possessed all rights to this parcel that could matter here. For ease of reference, we refer to the Beals as the owners of this parcel.

western edge of their land, because the activities of Hookstead and his predecessors did not meet the requirements for adversely possessing any land east of the survey line.

¶8    Turning to a chronology, according to Hookstead, he decided in February 2016 to stop using his parcels to grow crops and to start pasturing cattle, which would have required erecting a fence around his parcels. It is undisputed that in 2016 Hookstead erected fencing along the eastern edge of the disputed property—the center of the tree line—and that in doing so he removed some trees. After this, the Beals paid for a survey of the disputed property. In December 2016, the Beals erected their own fence along the survey line and in December of 2017, removed Hookstead's fencing. Also in 2017, and then again in 2019, Hookstead damaged the Beals' fence.

¶9    Hookstead commenced this action in 2019. He sought a declaratory judgment that he adversely possessed the disputed property under WIS. STAT. § 893.25. The Beals brought counterclaims of common law trespass and conversion, and counterclaims of property damage caused by crimes pursuant to WIS. STAT. § 895.446(1) (specifically, multiple claims for damage to trees and two sets of damage to fencing). The Beals alleged that, because Hookstead had not adversely possessed the disputed property, all of the following were located on the Beals' property: the fence that Hookstead erected, the trees that Hookstead removed, and the fence erected by the Beals that Hookstead damaged.

¶10    After both sides rested at the end of a five-day trial, Hookstead requested for the first time that the circuit court give the jury a special verdict question on the issue of adverse possession that would distinguish between the northern half and the southern half of the disputed property, and that would permit

the jury to award Hookstead a northern or a southern portion of the disputed property if it did not award him all of it. The court rejected this request and instead gave the jury a special verdict question that asked only if Hookstead had "proven adverse possession" of the disputed property, without distinguishing between northern and southern portions.

¶11 The circuit court also denied Hookstead's motion to preclude evidence on one of the Beals' counterclaims pursued under WIS. STAT. § 895.446(1) as time barred under the two-year statute of limitations in WIS. STAT. § 893.93(2)(a) for actions "by a private party upon a statute penalty."

¶12 The jury found that Hookstead did not prove adverse possession. The jury further found in the Beals' favor on each of their counterclaims and that punitive damages were appropriate: $54,745 in compensatory damages and $250,000 in punitive damages. In its order for judgment on the verdict, the circuit court reduced the punitive damages award to $200,000, and there is no dispute in this appeal that the court was required to make this reduction. *See* WIS. STAT. § 895.043(6) ("Punitive damages received … may not exceed" the greater of "twice the amount of any compensatory damages" or $200,000).

¶13 Hookstead did not prevail on three post-verdict motions, which match the issues that he now raises on appeal.

## DISCUSSION

## I. Jury Instructions For Adverse Possession

¶14 Hookstead argues that the circuit court should have granted his request to give the jury a special verdict question on his adverse possession claim that distinguished between the northern and southern portions of the disputed

5

property. He contends that juries in all adverse possession cases must have the opportunity to, as he puts it, "find that portions of a disputed area have been adversely possessed, rather than [being given only] an all-or-nothing choice." In addition to making this categorical argument, Hookstead argues that he was entitled to the special verdict question because there were references at trial to the existence of a northern portion and a southern portion that corresponded to the Beals' northeast and southeast parcels respectively. The Beals counter that it was not erroneous for the circuit court to frame the special verdict question in terms of a unitary disputed property because Hookstead consistently argued, from the filing of his pleadings through the close of evidence, that he was entitled to the disputed property in its entirety. We conclude that Hookstead does not show that the court erroneously exercised its discretion in not giving the instruction he wanted based on the court's determination that he failed to place in dispute as a material issue whether he adversely possessed only the northern or only the southern portions of the disputed property.[3]

## A. Additional Background

¶15 Before trial, Hookstead filed a motion in limine requesting that the court instruct the jury that Hookstead had "established what property he is claiming occupancy over," namely "the 'Disputed Area,' the area between where Hookstead built his fence in the treeline" and the survey line. However, in neither the motion nor in the proposed instruction did Hookstead distinguish between northern and southern portions of the disputed property.

---

[3] Because we conclude that Hookstead fails to establish that the circuit court erred in refusing to use the requested special verdict question, we do not address the parties' arguments as to whether any error would have been harmless.

¶16    After this, the parties jointly submitted a set of proposed jury instructions and a special verdict question. The jointly proposed instructions did not address the possibility that Hookstead would seek to prove that he had adversely possessed only one portion of the disputed property. Moreover, it referenced a single tree line, not a line divided into northern and southern portions. Similarly, the jointly proposed verdict question would have asked the jury to find whether Hookstead had proven each element of a claim of adverse possession as to the entire disputed property, without distinguishing among any portions of it.

¶17    The parties also filed a joint pre-trial report that included stipulations of fact and a summary of legal issues. The report described Hookstead as "assert[ing] that his [2016] fence was on the actual boundary line between the Hookstead (west) and Beal (east) properties." It further indicated that the issue for trial on Hookstead's claim was "[w]hether Mr. Hookstead adversely possessed the Disputed Area." While the report referenced separate tax parcels that corresponded to the parties' four parcels of land, it did not distinguish between northern and southern portions of the disputed property. Similarly at the outset of the trial, in an "abbreviated statement of facts and issues in this case," approved by both parties, the court described to the jury the unitary disputed property over which both parties claimed ownership, with the issue for trial identified as "whether Mr. Hookstead has Adverse Possession of the disputed area and whether Mr. Hookstead is liable for damages to the Beals."

¶18    In his opening statement, Hookstead's counsel told the jury that Hookstead claimed title to the disputed property, which he referenced either as a single unit or as consisting of the northern and southern portion. He did not talk about any purported differences between the portions relating to how Hookstead or his predecessors in interest used the land, or how it was enclosed, before 2016.

7

He merely mentioned distinctions in the permanence of the fencing that Hookstead erected in the northern and southern portions in 2016, and vaguely referenced a "distinction of trees in the tree line." Further, so far as he made clear, even these references appeared to be simply for purposes of context, to orient the jury to the nature of the unitary disputed property.

¶19 At trial, both parties at times elicited testimony that distinguished in some ways between the northern and southern portions, but neither side suggested that the jury would be asked to determine whether only a portion should be awarded to Hookstead.[4]

¶20 After the close of evidence and before closing arguments, at a jury instruction conference, Hookstead requested that the circuit court pose a verdict question reflecting alternative theories of liability. That is, he proposed to ask whether he had adversely possessed the northern portion, and separately to ask whether he had possessed the southern portion (leaving the possibility that the jury would find that Hookstead had possessed the whole disputed area by answering yes to both questions). Hookstead asserted that he went into trial planning to define his claim over the disputed property as including two portions—northern and southern—and that he had put on his case consistent with that strategic decision. Hookstead contended that the evidence at trial showed that there were factual differences between the northern and southern portions, and suggested that

---

[4] Examples of distinctions included the following. The trees in the tree line to the south tended to be older and more mature than those to the north. Hookstead testified that he planted his crops closer to the tree line in the northern portion, but in the southern portion he left more space between the edge of his planting rows and the tree line, in order to prevent erosion and to more easily turn around farming equipment. Hookstead also testified that it was easier to identify evidence of an "old" barbed wire fence marking the true boundary line in the northern portion compared to the southern portion, where there were only spools of barbed wire.

the jury could reasonably make alternative findings based on these differences. We observe, however, that Hookstead did not provide the court with a proffer summarizing trial evidence that showed material differences between the northern and southern portions. Nor did Hookstead explain how he could have relied on any such evidence to present a satisfactory closing argument, one that would have adequately addressed the court's apparent concerns about fairness to the Beals and potential jury confusion.

¶21     The Beals opposed Hookstead's request, arguing that at no point before the jury conference had Hookstead raised the notion that he had alternative theories under which he adversely possessed only the northern or only the southern portion of the disputed property. The Beals contended that allowing Hookstead to pursue this new strategy at such a late stage in the litigation would "completely screw[] up the damages questions" related to their counterclaims.

¶22     The court rejected Hookstead's request to include the alternative theories on the verdict question. The court acknowledged that the jury had heard evidence that distinguished between the northern and southern portions, but called this "a distinction without a difference." Further, the court ruled, there was "no evidence in the record that would support a finding that Mr. Hookstead had adverse possession of the north part and didn't have the adverse possession of the south part or vice versa." The court explained that "to [its] knowledge" both sides had tried the case consistently with Hookstead exclusively pursuing a theory of a unitary disputed property.

¶23     In his post-verdict motion for a new trial, Hookstead argued that the circuit court erred in failing to recognize that the evidence at trial created a material issue as to whether Hookstead had proven adverse possession over only

9

the northern portion or only the southern portion, as opposed to only an all or nothing choice. However, this motion did not contain a developed argument explaining how various distinctions between the two portions would be material in an attempt to apply the elements of adverse possession to one portion as opposed to the other.

¶24 The circuit court denied Hookstead's post-verdict motion. The court determined that the "pleadings did not raise an issue of adverse possession of two separate parcels" and the "case was pled on the basis of one "'Disputed Area.'" The court further reasoned in pertinent part as follows, with a name substituted for a party designation:

> The first time the Court was alerted to the possibility that Hookstead was making separate claims to the north and south portions is when he moved to have a separate verdict after the evidence was closed. It came as a complete shock to the Court that Hookstead entertained the idea that the evidence might support a finding of adverse possession as to one part of the [disputed] property and not the other.[5]

### B. Legal Standards

¶25 Under WIS. STAT. § 805.12(1), the circuit court prepares the special verdict "in the form of written questions relating only to material issues of ultimate fact and admitting a direct answer." Our supreme court has described the pertinent standards for reviewing whether a circuit court has erroneously exercised its discretion in creating a special verdict:

---

[5] As it had at the instruction conference, the circuit court in its order expressed the view that there was "no distinction in the evidence which could possibly support a verdict" for Hookstead as to one portion but not the other. However, as we discuss below, we do not affirm based on this concept.

> A circuit court has wide discretion in determining the words and form of a special verdict. We will not disturb a circuit court's determination unless the court has erroneously exercised its discretion.
>
> A court erroneously exercises its discretion if the special verdict questions fail to cover all issues of fact or are inconsistent with the law. Whether a special verdict reflects an accurate statement of the law applicable to the issues of fact in a given case presents a question of law that we review independently ….

*Gumz v. Northern States Power Co.*, 2007 WI 135, ¶¶23-24, 305 Wis. 2d 263, 742 N.W.2d 271 (citations omitted).

¶26 "The special verdict form is cabined by the issues raised by the pleadings *and in dispute*." *Hansen v. Texas Roadhouse, Inc.*, 2013 WI App 2, ¶13, 345 Wis. 2d 669, 827 N.W.2d 99 (emphasis added) (citing *Lagerstrom v. Myrtle Werth Hosp.-Mayo Health Sys.*, 2005 WI 124, ¶97, 285 Wis. 2d 1, 700 N.W.2d 201).

¶27 Turning to the substantive standards, "evidence of [adverse] possession must be 'clear and positive and must be strictly construed against the claimant.'" *Wilcox v. Estate of Hines*, 2014 WI 60, ¶20, 355 Wis. 2d 1, 849 N.W.2d 280 (quoted source omitted); *see also* WIS. STAT. § 893.25(2). Pertinent here, claimants bear the burden to prove: that they "actually occupied" claimed land; that the land is either "[p]rotected by a substantial enclosure" or "[u]sually cultivated or improved," *see* § 893.25(2)(b); and that there is evidence that "clearly define[s] the area in which specific activities or improvements occurred." *See Pierz v. Gorski*, 88 Wis. 2d 131, 134 n.2, 276 N.W.2d 352 (Ct. App. 1979).

### C.    Analysis

¶28    At the outset, we clarify that we do not rely on the circuit court's determination that the jury was not presented with evidence that could have supported a theoretical argument by Hookstead for claims to only the northern portion or only the southern portion of the disputed property.  Instead, as we now explain, our focus is on the circuit court court's "surprise" and "shock" at Hookstead's late request for a special verdict question based on the alternative theories of adverse possession, and the court's assessment that Hookstead failed to present those theories at trial.  The court's statements reflect implicit findings that Hookstead failed, until after the close of evidence, to apprise his opponent or the jury of the alternative theories.

¶29    As for notice to Hookstead's opponents, the court implicitly found that Hookstead failed to properly place the Beals on notice of any alternative theories of adverse possession, and that they would have suffered prejudice if the court had given the special verdict question requested by Hookstead because the Beals had already committed to decisions at trial regarding how to present their defenses to adverse possession and their counterclaims based on Hookstead's exclusive theory of a unitary disputed property.

¶30    As for notice to the jury, the court implicitly found that Hookstead failed to apprise the jury, during the course of trial before the close of evidence, that the jury would need to decide whether he had possessed only the northern portion or only the southern portions, and that the requested special verdict question risked confusing jurors.  In other words, jurors paying proper attention to the evidence and the arguments during trial would have reasonably understood that Hookstead had exclusively made an all-or-nothing argument, and therefore

the special verdict question requested by Hookstead would have diverged enough from the content of trial to risk confusing them.

¶31 Hookstead fails to show that either of these implicit findings were clearly erroneous. And based on these implicit findings, we conclude that the court did not omit a material issue of ultimate fact by declining to give the requested special verdict question.

¶32 In our analysis of this issue, we make several assumptions in Hookstead's favor without deciding that they are correct. First, we assume that, Hookstead's operative complaint was pled in a way that would have permitted him to pursue at trial the alternative theories that he articulated for the first time at the jury instruction conference after the close of evidence.[6] Second, we assume that,

---

[6] Based on this first assumption in Hookstead's favor regarding the operative complaint, we need not address his reliance on *Gutierrez v. People's Management of Texas I, Ltd.*, 277 S.W.3d 72, 79 (Tex. App. 2009), which he cites as purported persuasive authority based on Texas law governing what claimants must particularly plead in an adverse possession case in order to make particular claims at trial. Explaining briefly, Hookstead cites *Gutierrez* for the proposition that, when a claim of adverse possession describes property that contains "constituent parts, with separate legal descriptions," there is a "reasonable inference" that "the claim will run to those constituent parts or elements individually." *Id.* at 79. The court in *Gutierrez* determined that the trial court erred in denying a request to charge the jury with adverse possession verdicts addressing constituent parts. *See id.*

If Hookstead intends to make a broader argument based on *Gutierrez*, we would reject that argument. The broader argument would be based on the fact that the court in *Gutierrez* went beyond the issue of whether the alternative claim was preserved by the pleadings, and proceeded to consider differences in the constituent parts of the overall possession claim. *See id.* The court applied a rule of the Texas Rules of Civil Procedure that creates "a substantive, non-discretionary directive requiring trial courts to submit requested questions to the jury, if the pleadings and *any evidence* support them." *Id.* at 78 (citing TEX. R. CIV. P. 278) (emphasis added). Under this Texas standard, "it is reversible error to refuse" "to support submission of a valid theory of recovery" if there is "more than a scintilla of evidence to support submission." *Id.* In contrast, under Wisconsin law, Hookstead was obligated to do more than point to a "scintilla" of evidence. He had to show that the theories that he now pursues were placed in dispute at trial, which at a minimum required him to apprise the opposing party and jury of those theories and at least suggest how the evidence supported the articulated theories. *See Hansen v. Texas Roadhouse,*

(continued)

---

13

leading up to and during trial, Hookstead clearly identified northern versus southern portions of the disputed property. Third, we assume that there was at least some material evidence presented at trial that a jury *could have* relied on to support a verdict of adverse possession of only the northern or only the southern portion, despite the circuit court's contrary finding.[7]

¶33    Even with these assumptions in Hookstead's favor, we conclude that the circuit court did not clearly err in finding that his only clear adverse possession theory at trial, up to the time of the instruction conference, was based on an all-or-nothing claim. We have summarized above some of the pretrial submissions that appeared to commit the parties to an agreement of a trial on that basis. Against the backdrop of these submissions, it was reasonable for the court to determine that Hookstead's limited references at trial distinguishing—in what were on their face only *possibly* material ways—between northern and southern portions would have been reasonably construed by the other side and by jurors as merely for general context or orientation purposes, as part of an exclusive theory of adverse possession to the entire disputed property.[8] In the same vein, as we have

---

*Inc.*, 2013 WI App 2, ¶13, 345 Wis. 2d 669, 827 N.W.2d 99 ("The special verdict form is cabined by the issues … in dispute).

[7] In making this assumption, we recognize that the circuit court's conclusion that there was no evidence regarding material differences between the northern and southern portions was reasonable to the extent that the court essentially meant to convey that various differences were too subtle to matter. While some details regarding the northern and southern portions varied (*e.g.*, the age and thickness of the trees, the width of disputed property), even now on appeal Hookstead fails to point to evidence that the character of the two portions was not generally the same. The evidence was that the disputed property was primarily boundary land between agricultural fields featuring a continuous line of trees, brush, and rocks.

[8] We assume without deciding that Hookstead's joining in pre-trial submissions that did not distinguish between the northern and southern portions did not constitute any form of forfeiture, waiver, or estoppel by Hookstead, such that any of these doctrines barred him from being able to pursue the special verdict question after the close of evidence.

summarized it, Hookstead's opening argument did not alert opposing counsel or the jury to the possibility that any difference between the northern and southern portions mattered in any way other than to help the jury understand Hookstead's claim to the disputed property in its entirety. To the contrary, the opening previewed that, as counsel expressed it to the jury, the "critical factual determination[s]" it would need to make related to "the property" or "the center of the tree line" without reference to having to make those determinations for multiple constituent parts.

¶34 It supports the circuit court's determination that evidence presentation at trial was spread out over five days. The evidence that Hookstead might have, but did not, rely on to potentially distinguish between northern and southern portions in a possibly material way was interspersed with other evidence and argument that frequently involved references to the disputed property in its entirety.

¶35 On the prejudice-to-the-Beals issue, the Beals point out that they did not elicit testimony at trial from their tree expert regarding how much of the damages caused by Hookstead's removal of trees was attributable to the northern or the southern portions specifically. Hookstead's argument in reply has no merit. He points out that this expert had to deduce the number of removed trees because he inspected the tree line only after their removal. This fails to explain why we should conclude that the Beals, if timely apprised of the issue by Hookstead, could not have elicited from the expert a reasonably reliable account of how much of the tree removal had occurred in each portion.

¶36 For the first time in his reply brief, Hookstead makes an off-point argument. It is that the Beals were alerted through discovery to the existence of

physical differences between the two portions. We put to one side the fact that this argument comes too late in the appellate briefing process, and we also assume without deciding that various references in the discovery materials established the existence of differences (even though, as with the evidence adduced at trial, the discovery materials included frequent references to a unitary disputed area, consisting of a single stretch of land between the survey and tree lines). Even with those points ignored, this argument does not help Hookstead on the point that matters: the court's implicit finding, not shown to be clear error, that Hookstead failed throughout the course of trial to apprise opposing counsel and the jury of the alternative theories of liability.

¶37 On a related note, Hookstead contends that the Beals should have been aware by the time of trial that his claim over the unitary disputed property would necessarily require them to defend claims over only portions of that property. But the issue here is not whether Hookstead *could have* gone to trial with theories that alternatively sought possession of only portions. Hookstead's argument is based on hypothetical facts contrary to the circuit court's findings—the hypothetical in which a party seeking adverse possession clearly and timely apprises opposing counsel and the jury of the theory of liability at issue—and does not constitute an argument that the circuit court clearly erred in making the findings we have summarized above. At most, Hookstead identifies evidence that could have potentially supported a contrary finding that—even though Hookstead did not clearly state the alternative theories—the Beals were constructively on notice that he was implicitly pursuing the alternative theories.

¶38 Hookstead stresses that, in a footnote in *Pierz*, we stated that "the finder of fact should be offered an opportunity to find that portions of the land have been adversely possessed rather than an all-or-nothing choice." *Pierz*, 88

Wis. 2d at 134 n.2. Hookstead effectively interprets this statement, considered in isolation, to support the proposition that adverse possession claims over any possible portions of property subject to a claim are inherently material at every adverse possession trial and are implicitly placed in dispute, regardless how indistinctly the alternative claims to portions are raised before and during trial. Under this reading of *Pierz*, the circuit court omitted a material issue from the verdict question in a way that is inconsistent with *Pierz*. However, Hookstead pulls the statement in *Pierz* out of its context and omits qualifications that are important here. In the same footnote of *Pierz* cited by Hookstead, we further explained that "[i]t is the burden of the party claiming adverse possession to clearly define the area in which specific activities or improvements occurred." *Id.* Under all the circumstances we have discussed, and even with the assumptions in Hookstead's favor stated above, the circuit court made a reasonable decision based on its implicit findings that giving Hookstead's requested special verdict would have amounted to trial-by-ambush on the Beals and also risked confusing the jury.

¶39 Put another way, the statement in *Pierz* about avoiding all-or-nothing choices for factfinders has limited applicability when the adverse possession claimant "elects to proceed on an all-or-nothing basis." *See Droege v. Daymaker Cranberries, Inc.*, 88 Wis. 2d 140, 147, 276 N.W.2d 356 (Ct. App. 1979). In *Droege*, we explained that when

> the adverse possessor elects to proceed on an all-or-nothing basis and fails to provide the trial court with evidence of the extent of actual occupancy upon which the land could be partitioned, failure to prove adverse occupancy of any substantial portion of the land is fatal to the entire claim.

*Id.* It is true that our assumption that Hookstead presented some material evidence distinguishes this case in some ways from the context in *Droege*. Nevertheless,

17

the larger point made in this statement applies. Contrary to Hookstead's reading of *Pierz*, *Droege* shows that the way that an adverse possessor pursues a claim can limit the claimant to the risks of an all-or-nothing choice under certain circumstances. The rule that emerges from the two cases is that adverse possession claimants certainly *can*, and must generally be allowed to, pursue theories of adverse possession to portions within claims on larger parcels of property, so long as they pursue those theories in a timely manner.[9] *See Pierz*, 88 Wis. 2d at 134 n.2; *see also* WIS. STAT. § 893.25(2)(b) (allowing adverse possession "[o]nly to the extent" actual occupancy, along with other requirements, are proven); *Droege*, 88 Wis. 2d at 147 (When "evidence was presented as to the extent of occupancy of only a portion of the land, only that portion may be awarded."). Here, Hookstead does not show that the circuit court erred in concluding that he proceeded on an all-or-nothing basis by failing to take any steps to notify opposing counsel or the jury that he was pursuing the theories of liability based on what we assume was material evidence of actual occupancy.

## II.    Statute Of Limitations For Damage To Property Counterclaims

¶40    Under WIS. STAT. § 895.446(1), a person "who suffers damage or loss by reason of intentional conduct" that violates any of a number of criminal statutes, including WIS. STAT. § 943.01, criminal damage to property, "has a cause of action against the person who caused the damage or loss." Among the Beals'

---

[9] Hookstead draws our attention to numerous Wisconsin cases that, in his words, "involv[e] partial adverse possession success" in the context of jury trials. S*ee Krembs v. Pagel*, 210 Wis. 261, 246 N.W. 324 (1933); *Menzner v. Tracy*, 247 Wis. 245, 19 N.W.2d 257 (1945); *Fabry v. Jagiello*, No. 2018AP89, unpublished slip op. (WI App Mar. 19, 2019). But these references are unavailing. These cases do not stand for the proposition that, when a claimant fails to apprise the opponent and the jury of a theory of partial adverse possession throughout trial, a circuit court must nevertheless give a special verdict question of the type Hookstead sought here.

counterclaims are some for intentional damage to property under § 895.446(1). Separately, WIS. STAT. § 893.93(2)(a) establishes in pertinent part a two-year statute of limitations for "[a]n action by a private party upon a statute penalty, … except when the statute imposing it provides a different limitation."

¶41    Bearing those statutes in mind, Hookstead argues that the circuit court erred in concluding that the two-year limitations period in WIS. STAT. § 893.93(2)(a) for actions "by a private party upon a statute penalty" did not apply to the Beals' counterclaims under WIS. STAT. § 895.446(1).

¶42    The Beals do not dispute that, if it applies, a two-year statute of limitations would bar one of the Beals' counterclaims.  The only counterclaim that Hookstead identifies as purportedly time-barred is the one under WIS. STAT. § 895.446(1) that specifically relates to Hookstead's 2016 removal of trees.  Thus, Hookstead does not argue that the Beals' trespass or conversion counterclaims were barred, nor does he argue that the Beals' other counterclaim pursued under § 895.446(1) (based on conduct in 2017 and 2019) was barred.

¶43    "Determining which statute of limitations applies to an action is a question of law which we review de novo." *Hegarty v. Beauchaine*, 2001 WI App 300, ¶14, 249 Wis. 2d 142, 638 N.W.2d 355; *see also* *South Milwaukee Sav. Bank v. Barrett*, 2000 WI 48, ¶18, 234 Wis. 2d 733, 611 N.W.2d 448 (applying independent review to whether the two-year statute of limitations for a private party action upon a statute penalty applied).

¶44    As we explain below in applying precedent of our supreme court, we narrowly construe WIS. STAT. § 893.93(2)(a), and conclude that an action pursued under WIS. STAT. § 895.446(1) is not an action "by a private party upon a statute penalty" and therefore the two-year limitation does not apply to § 895.446(1)

actions. Although § 895.446(1) actions bear some resemblance to "statute penalty" actions, we conclude that the mixed evidence regarding the statute's purpose weighs against being deemed actions "by a private party upon a statute penalty." We do not address what other statutes of limitations might apply to § 895.446(1) actions, because Hookstead exclusively relied on § 893.93(2)(a) in the circuit court and now on appeal.[10]

### A. Additional Legal Standards

¶45 WISCONSIN STAT. § 893.93(2)(a) calls for a determination whether the counterclaims at issue here pursued under WIS. STAT. § 895.446(1) are actions "by a private party upon a statute penalty."[11] This in turn requires us to determine whether the purposes of § 895.446 are more "penal" or more "remedial" in nature, because the more penal they are the more likely the cause of action provided in the statute is to be categorized as a "statute penalty." *See South Milwaukee Sav. Bank v. Barczak*, 229 Wis. 2d 521, 532-33, 600 N.W.2d 205 (Ct. App. 1999) (The issue of whether to apply the "statute penalty" limitations period "requires us to

---

[10] Hookstead does not dispute that the Beals' counterclaims were not time barred if, as the Beals assert, the six-year limitations periods contained in WIS. STAT. § 893.93(1)(a) (2015-16) or WIS. STAT. § 893.52(1) applied, instead of the two-year limitation in § 893.93(2)(a).

Separately, because we conclude that the circuit court did not err in failing to apply the two-year limitation in WIS. STAT. § 893.93(2)(a) to the WIS. STAT. § 895.446 counterclaims, we need not address the parties' arguments regarding whether any error would have been harmless.

[11] WISCONSIN STAT. § 893.93(2)(a) provides:

> (2) The following actions shall be commenced within 2 years after the cause of action accrues or be barred:
>
> (a) An action by a private party upon a statute penalty, or forfeiture when the action is given to the party prosecuting therefor and the state, except when the statute imposing it provides a different limitation.

interpret the statute in question, to ascertain its intended purpose, and to decide whether the statute redressed a public wrong or remedied an individual harm.").[12]

¶46     A statutory cause of action is deemed penal if it is designed to redress wrongs done to the public, and remedial if designed to redress wrongs done to individuals. *Erdman v. Jovoco, Inc.*, 181 Wis. 2d 736, 762, 512 N.W.2d 487 (1994); *see also Barczak*, 229 Wis. 2d at 533-35 (weighing benefit to the public relative to the benefit to individuals).

¶47     The following are pertinent factors to be used in determining whether the purposes of a statute are more punitive in nature and therefore the statute is more likely to be a statute penalty, or instead if the statute's purposes are more remedial and therefore the statute is less likely to be a statute penalty. If a statute provides for the awarding of treble damages to the plaintiff, this weighs in favor of a determination that it has an overall punitive purpose. *See Barczak*, 229 Wis. 2d at 533 (citing *Erdman*, 181 Wis. 2d at 761). Amplified damages suggest redress of wrongs to the public, because they "encourage private enforcement in an area where government regulation alone would not be adequate." *Erdman*, 181 Wis. 2d at 761. An additional feature of a statute that can weigh in favor of it being deemed a statute penalty is when it provides mechanisms for both "public and private enforcement," that is, when it allows private claimants to pursue relief and also allows prosecutors, as agents of the government, to pursue criminal penalties, civil forfeitures, or fines. *See Barczak*, 229 Wis. 2d at 534 (concluding that the absence of criminal penalties and other "public and private enforcement

---

[12] *See also South Milwaukee Sav. Bank v. Barrett*, 2000 WI 48, ¶23, 234 Wis. 2d 733, 611 N.W.2d 448 (adopting the statute of limitations analysis in *South Milwaukee Sav. Bank v. Barczak*, 229 Wis. 2d 521, 531-36, 600 N.W.2d 205 (Ct. App. 1999)).

mechanisms" weighed against applying the two-year limitation for statute penalties).

¶48    But the case law contains nuanced distinctions.  A statutory cause of action may bear some hallmarks of a punitive, public-oriented purpose, but nonetheless be primarily remedial in nature.  *See* ***id.*** at 534-35 (noting some factors supporting penal purpose, but concluding the cause of action at issue was nonetheless not a statute penalty); *see also* ***Erdman***, 181 Wis. 2d 760-61 (noting that statutory anti-trust claims are both remedial and punitive in nature, and qualify as "actions by a private party upon a statute penalty").  Thus, for example, while the awarding of double or treble damages in itself signals a potentially punitive purpose, this does not necessarily render a statutory cause of action a statute penalty.  *See* ***Erdman***, 181 Wis. 2d at 762 (double damages provision of statutory cause of action at issue did not change its "fundamental nature" as "primarily intended to benefit individual" claimants); ***Barczak***, 229 Wis. 2d at 534-35 (concluding that a statutory cause of action was not a statute penalty despite treble damages provision).  On a related note, a statutory cause of action is not a statute penalty when the "benefit derived by individuals" from the cause of action "substantially outweigh[s]" the "benefit derived by the general public" despite bearing some signs of having a penal purpose.  *See* ***Barczak***, 229 Wis. 2d at 534-35.

¶49    We also bear in mind that appellate courts "interpret[] statutes of limitations so that 'no person's cause of action will be barred unless clearly mandated by the legislature.'"  ***Erdman***, 181 Wis. 2d at 760 (quoting ***Saunders v. DEC International, Inc.***, 85 Wis. 2d 70, 74, 270 N.W.2d 176 (1978)).  Consistent with this rule of interpretation, "[a]bsent a clear legislative mandate, case law instructs that the two-year statute of limitations must be narrowly construed in

favor of plaintiffs to avoid extinguishing otherwise meritorious claims." ***Barczak***, 229 Wis. 2d at 535 (discussing WIS. STAT. § 893.93(2)(a)).

¶50    Turning to the substantive type of action at issue here, WIS. STAT. § 895.446(1) is a vehicle for those "who suffer[] damages or loss by reason of intentional conduct" that is prohibited by an enumerated series of criminal statutes. Such a person has "a cause of action against the person who caused the damage or loss." Sec. 895.446(1). Each of the enumerated criminal prohibitions come from WIS. STAT. ch. 943 (Crimes against property) and pertinent here includes intentionally causing damage to property under WIS. STAT. § 943.01(1). *See* § 895.446(1).

¶51    If a civil plaintiff prevails on a claim under WIS. STAT. § 895.446(1), "he or she may recover all of the following:"

>    **(a)** Actual damages, including the retail or replacement value of damaged, used, or lost property, whichever is greater, [including] for a violation of s. 943.01 ….

>    **(b)** All costs of investigation and litigation that were reasonably incurred, including the value of the time spent by any employee or agent of the victim.

>    **(c)** Exemplary damages of not more than 3 times the amount awarded under par. (a). No additional proof is required under this section for an award of exemplary damages under this paragraph.

Sec. 895.446(3); *see also **Estate of Miller v. Storey***, 2017 WI 99, ¶49, 378 Wis. 2d 358, 903 N.W.2d 759 (interpreting sub. (3)(b) to allow awarding of attorney fees).

B.    **Analysis**

¶52    For reasons we have explained, the possibility that a plaintiff can obtain exemplary damages of up to three times the actual damages lends some

23

support to a determination that an action filed under WIS. STAT. § 895.446(1) has a punitive purpose. *See **Estate of Miller***, 378 Wis. 2d 358, ¶69 n.32 ("'Exemplary damages' are synonymous with 'punitive damages.'"). It undermines this point, however, that exemplary damages are not automatically awarded under § 895.446(3) to a plaintiff who has met each of the elements of his or her claim under sub. (1), nor are the damages necessarily trebled. *See **id.***, ¶69 (trier of fact has discretion over whether to award exemplary damages and if so, the amount). This contrasts the exemplary damages under § 895.446(3)(c) with other statutory causes of action under which automatic double and treble damages are awarded based on proof of the elements. *See **Cieslewicz v. Mutual Serv. Cas. Ins. Co.***, 84 Wis. 2d 91, 101-02, 267 N.W.2d 595 (1978) (unlike common law punitive damages, "multiple damages" like treble damages do not require the additional showing of "particular state of mind or outrageous character of the conduct" and "are assessed whenever the statutory requirements are met, and the plaintiff is entitled to multiple damages on that showing alone").

¶53     Hookstead notes that our supreme court, in the context of discussing a predecessor statute to WIS. STAT. § 895.446, stated that "[a] statute creating a treble damages remedy is regarded as punitive rather than remedial." *See **Tri-Tech Corp. of Am. v. Americomp Servs., Inc.***, 2002 WI 88, ¶¶1, 21, 254 Wis. 2d 418, 646 N.W.2d 822 (discussing WIS. STAT. § 895.80 (1999-2000)). The first problem with Hookstead's reliance on this statement as dispositive here is that the predecessor version of § 895.446 awarded automatic treble damages and, as we have explained, the current version does not. *See **id.***, ¶20; 2003 Wis. Act 138, §§ 21, 23. Second, the court in ***Tri-Tech*** was not addressing a statute of limitations issue, but instead considering application of the rule that punitive statutes are strictly construed, which is a different context. *See **Tri-Tech***, 254

24

Wis. 2d 418, ¶21.  Third, there is no suggestion in *Tri-Tech* that the court intended to alter the comprehensive approach laid out in *Erdman* and applied in *Barczak*, under which even a statute that may tend to show some punitive purpose through the availability of treble damages does not necessarily create a statute penalty action.

¶54     Turning to the legislature's apparent purpose in authorizing actions under WIS. STAT. § 895.446(1), Hookstead emphasizes that such actions vindicate the public's "right to be free from crime."  *See Estate of Miller*, 378 Wis. 2d 358, ¶59 (noting that criminal prosecutions are the "exclusive province" of government actors and a private action "that enforces criminal proscriptions" "vindicates the public right to be free from crime").  It is also true that, while § 895.446 does not itself provide for criminal penalties or other public enforcement mechanisms, it operates in parallel to the potential criminal prosecution of the crimes enumerated by statutory references in § 895.446(1).  *See e.g.*, WIS. STAT. § 943.01(1) (classifying intentional damage to physical property without the owner's consent as a Class A misdemeanor).

¶55     These factors weigh somewhat in favor of penal purpose as understood in statute penalty context.  The discussion of WIS. STAT. § 895.446 in *Estate of Miller* suggests that this is not the easy case in which the direct benefits to plaintiffs who bring actions under § 895.446 are substantially outweighed by the more general benefits to the public.

¶56     However, the following factors persuade us against application of the two-year statute.  Claimants such as the Beals here, pursuing claims under WIS. STAT. § 895.446(1), like the plaintiffs in *Erdman* and *Barczak*, are motivated in significant part to remedy the harms that they claim have been done to them

individually as the victims of property crimes.  *See* § 895.446(1) (granting cause of action to a "person *who suffers damage or loss*," *i.e.*, the victim of one of the enumerated crimes (emphasis added)).  In the course of discussing the awarding of litigation costs, our supreme court has noted that § 895.446(3) provides financial incentives for individual plaintiffs to advance both the public interest *and* their own private interests.  *See **Estate of Miller***, 378 Wis. 2d 358, ¶59.  On balance, and in the final analysis applying the rule of narrow construction highlighted in cases such as ***Erdman*** and ***Barczak***, we do not discern "a clear legislative mandate" to apply a two-year limitation to such actions, particularly given the mixed signals provided by the available remedies under § 895.446(3).

## III.    Punitive Damages

¶57    Hookstead argues that even the reduced punitive damages award of $200,000 violated his due process rights because it was "disproportionate to his wrongdoing and was more than necessary to deter him from future wrongdoing."  Applying the pertinent factors under the constitutional analysis, we conclude that the punitive damages award was not excessive.

### A.    Additional Background

¶58    Gary Beal's pertinent trial testimony included the following.  During a visit to the Beals' residence, Hookstead initially agreed to help the Beals pay for a survey of the boundary line, but then reversed course and demanded that the Beals "stop the survey."  When Gary Beal refused this demand, Hookstead threatened to "put [Beal] through a blood bath of Court and lawyer's fees" if Beal did not leave "the fence where [Hookstead had] it."

¶59 In a later incident, when Beal was inspecting the places where Hookstead had removed trees, Hookstead drove up to Beal in his truck and started "screaming" at him. This included screaming that Beal was trespassing and that Beal needed to "get off [Hookstead's] land." Beal further testified that Hookstead three times "screamed" at Beal, "'I'm going to steal your land by adverse possession.'" The testimony was corroborated by the testimony of an arborist who was present.

¶60 To repeat, the jury made the following findings: that Hookstead intentionally damaged and converted the Beals' property and trespassed on it; and that "Hookstead's conduct toward the Beals" was "malicious or in intentional disregard of the Beals' rights." This verdict was supported in part by uncontradicted testimony that Hookstead, without permission, entered land that the jury determined belonged to the Beals, removed trees, erected fencing cutting off part of this land, and later damaged fencing erected by the Beals.

¶61 As part of its reasoning in denying Hookstead's motion to reduce the punitive damages award, the circuit court stated the following, with party names substituted for party designations:

> The jury could have found that[,] in view of Hookstead's net worth [of] $13,000,000, the Beals were financially vulnerable as compared to Hookstead. The evidence supports a finding that Hookstead's conduct involved repeated actions over a period of time and were not an isolated incident. The evidence would also support a finding that the harm was the result of intentional malice, which the jury explicitly found in its verdict.

## B. Legal Standards

¶62 A party may recover punitive damages "if evidence is submitted showing that the defendant acted maliciously toward the plaintiff or in an

intentional disregard of the rights of the plaintiff." WIS. STAT. § 895.043(3). "Once the judge has determined that the issue of punitive damages is properly before the jury, whether to actually award punitive damages 'in a particular case is entirely within the discretion of the jury.'" *Kimble v. Land Concepts, Inc.*, 2014 WI 21, ¶44, 353 Wis. 2d 377, 845 N.W.2d 395 (quoted source omitted). However, "[t]he Due Process Clause of the Fourteenth Amendment 'imposes substantive limits on the size of a punitive damages award.'" *Id.* (quoted source omitted). We review the size of an award of punitive damages under a de novo standard "to ensure it accords with the constitutional limits of due process." *Id.*, ¶38.

¶63     "A punitive damages award is 'excessive, and therefore violates due process,' if it is more than necessary to serve the purposes of punitive damages, or inflicts a penalty or burden on the defendant that is disproportionate to the wrongdoing.'" *Id.*, ¶45 (quoted source omitted). Appellate courts consider the following six factors in determining whether an award of punitive damages is constitutionally excessive:

> (1) The grievousness of the acts; (2) The degree of malicious intent; (3) Whether the award bears a reasonable relationship to the award of compensatory damages; (4) The potential damage that might have been caused by the acts; (5) The ratio of the award to civil or criminal penalties that could be imposed for comparable misconduct; and (6) The wealth of the wrongdoer.

*Id.*, ¶47.[13]

---

[13] Our supreme court has described these factors as "substantively identical" to a federal test that is applied in reviewing the size of a punitive damages awards, which we do not recite here. *Kimble v. Land Concepts, Inc.*, 2014 WI 21, ¶46-47, 353 Wis. 2d 377, 845 N.W.2d 395 (quoting another Wisconsin case that in turn cites *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 568 (1996)).

¶64    Our review of constitutional principles is de novo, but we accept pertinent findings of fact by the circuit court unless they are clearly erroneous. *See Cooper Indus., Inc. v. Leatherman Tool Grp., Inc.*, 532 U.S. 424, 440 & n.14 (2001) (noting that federal district courts can make credibility assessments and that, although the overall review of the size of punitive damages on a due process challenge is de novo, "it of course remains true that the Court of Appeals should defer to the District Court's findings of fact unless they are clearly erroneous.").

**C.    Analysis**

¶65    Applying the factors noted above to the uncontested findings of the jury and the circuit court, we conclude that the amount of punitive damages awarded in this case does not exceed due process limits.

¶66    Hookstead either concedes or fails to dispute that three relevant factors support the conclusion that the punitive damages award was not excessive: the award as reduced by the circuit court bears a reasonable relationship to the award of compensatory damages; he is wealthy relative to the size of the award; and the ratio of the award to civil or criminal penalties that could be imposed for comparable misconduct is proportionate.[14]

---

[14] On the last point, Hookstead does not respond to the Beals' contention that Hookstead's conduct, as found by the jury and credited by the circuit court, could have supported criminal charges of multiple counts each for criminal trespass and criminal damage to property, including at least one count of damage worth more than $2,500. *See* WIS. STAT. §§ 943.01(1), (2)(d), 943.13(1m). A conviction for criminal trespass is punishable by a forfeiture of $1,000, and a conviction for criminal damage to property that reduces the property's value by more than $2,500 is punishable by fines not exceeding $10,000, 3.5 years imprisonment, or both. *See* WIS. STAT. §§ 939.50(3)(i), 939.52(3)(b), 943.01(2)(d), 943.13(1m). We take Hookstead's silence on this point as a concession that this factor supports upholding the punitive damages award. *See United Co-op. v. Frontier FS Co-op.*, 2007 WI App 197, ¶39, 304 Wis. 2d 750, 738 N.W.2d 578 (appellant's failure to respond in reply brief to an argument made in response brief may be taken as a concession). At the same time, we bear in mind that, while a comparison of a defendant's
(continued)

¶67 Hookstead primarily argues that his conduct was not so grievous or maliciously intended as to justify the punitive damages award. This argument evokes the rule that "'the degree of reprehensibility of the defendant's conduct'" is the most important "'indicium of the reasonableness of a punitive damage[s] award.'" *See Kimble*, 353 Wis. 2d 377, ¶48 (quoted source omitted and alteration in *Kimble*). Our supreme court has adopted from the U.S. Supreme Court the following considerations as relevant in weighing the degree of reprehensibility:

> "whether: the harm caused was physical as opposed to [merely] economic; the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; the target of the conduct had financial vulnerability; the conduct involved repeated actions or was an isolated incident; and the harm was the result of intentional malice, trickery, or deceit, or mere accident."

*Id.*, ¶49 (quoting *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 419 (2003)).

¶68 Hookstead's argument fails for at least this reason: the facts found by the jury and the circuit court support the conclusion that Hookstead acted maliciously. For example, the harms caused by a neighbor shouting threatening language, and sneaking onto the neighbor's property without permission in order to do damage, are not solely economic in nature. The jury found that Hookstead intentionally damaged and trespassed on the Beals' property, all against the backdrop of uncontested testimony that Hookstead threatened to "steal" that land through adverse possession and make the Beals pay big legal bills when they told him they were going to order a survey. The conduct credited by the jury and the

conduct with pertinent criminal or civil penalties bears on the "'seriousness'" of the conduct, such a comparison has "'less utility'" in assessing the amount of a damage award against a constitutional standard. *See Kimble*, 353 Wis. 2d 377, ¶69 (quoted source omitted).

circuit court did not involve merely expressing disagreement with a neighbor over disputed property, nor did it involve an isolated incident or short period of aggressive interactions. It is true that there was evidence that could have supported a jury finding that Hookstead believed at the time of his abusive conduct that he rightfully possessed the disputed property through adverse possession. However, he fails to explain why the jury could not reasonably decide to discount this evidence regarding his beliefs and reach the findings that we describe above. More generally, Hookstead makes only selective references to the evidence and fails to analyze all pertinent findings under the correct legal standards.

## CONCLUSION

¶69 For the foregoing reasons we affirm the judgment and the circuit court's denial of Hookstead's post-judgment motions.

*By the Court*.—Judgment and order affirmed.

Not recommended for publication in the official reports.